

1   LINDA WENDELL HSU    (SBN 162971)
    LISA A. WILSON      (SBN 190392)
2   SELMAN BREITMAN LLP
    33 New Montgomery, Sixth Floor
3   San Francisco, CA 94105
    Telephone: (415) 979-0400
4   Facsimile: (415) 979-2099    **E-filing**

5   Attorneys for Plaintiff
    SCOTTSDALE INSURANCE COMPANY

6

7

8                   UNITED STATES DISTRICT COURT

9               NORTHERN DISTRICT OF CALIFORNIA

10          C  08    3957 SC

11  SCOTTSDALE INSURANCE COMPANY,    CASE NO.

12          Plaintiff,                COMPLAINT FOR
                                      DECLARATORY RELIEF,
13          v.                        EQUITABLE CONTRIBUTION
                                      AND INDEMNITY
14  ADMIRAL INSURANCE COMPANY, and
    DOES 1 through 50, inclusive,
15                                    DEMAND FOR JURY TRIAL
            Defendants.
16

17

18      Plaintiff SCOTTSDALE INSURANCE COMPANY alleges as follows:

19      1.   SCOTTSDALE INSURANCE COMPANY ("SCOTTSDALE") is an Ohio

20  corporation with its principal place of business in Scottsdale,

21  Arizona.  SCOTTSDALE is an insurance company which is and was, at

22  all times relevant herein, authorized to transact business in the

23  State of California, County of Contra Costa.

24              JURISDICTIONAL ALLEGATIONS

25      2.   SCOTTSDALE is informed and believes and thereon alleges

26  that defendant ADMIRAL INSURANCE COMPANY ("ADMIRAL") is a

27  Delaware corporation with its principal place of business in

28  Cherry Hill, New Jersey.  ADMIRAL is an insurance company which

                          1

1  LINDA WENDELL HSU   (SBN 162971)
   LISA A. WILSON     (SBN 190392)
2  SELMAN BREITMAN LLP
   33 New Montgomery, Sixth Floor
3  San Francisco, CA 94105
   Telephone: (415) 979-0400
4  Facsimile: (415) 979-2099

5  Attorneys for Plaintiff
   SCOTTSDALE INSURANCE COMPANY
6

7

8                UNITED STATES DISTRICT COURT

9               NORTHERN DISTRICT OF CALIFORNIA

10

11 SCOTTSDALE INSURANCE COMPANY,    CASE NO.

12          Plaintiff,              COMPLAINT FOR
                                    DECLARATORY RELIEF,
13     v.                           EQUITABLE CONTRIBUTION
                                    AND INDEMNITY
14 ADMIRAL INSURANCE COMPANY, and
   DOES 1 through 50, inclusive,
15                                  DEMAND FOR JURY TRIAL
          Defendants.
16

17

18     Plaintiff SCOTTSDALE INSURANCE COMPANY alleges as follows:

19     1.   SCOTTSDALE INSURANCE COMPANY ("SCOTTSDALE") is an Ohio

20 corporation with its principal place of business in Scottsdale,

21 Arizona.  SCOTTSDALE is an insurance company which is and was, at

22 all times relevant herein, authorized to transact business in the

23 State of California, County of Contra Costa.

24                   **JURISDICTIONAL ALLEGATIONS**

25     2.   SCOTTSDALE is informed and believes and thereon alleges

26 that defendant ADMIRAL INSURANCE COMPANY ("ADMIRAL") is a

27 Delaware corporation with its principal place of business in

28 Cherry Hill, New Jersey.  ADMIRAL is an insurance company which

                                1

1  is and was, at all times relevant herein, authorized to transact

2  business in the State of California, County of Contra Costa.

3      3.   The jurisdiction of this Court over the subject matter

4  of this action is predicated on 28 U.S.C. §1332.  Plaintiff

5  SCOTTSDALE is informed and believes and thereon alleges that the

6  matter in controversy exceeds, exclusive of interest and costs,

7  the sum specified by 28 U.S.C. § 1332.

8      4.   This is an action for declaratory relief pursuant to 28

9  U.S.C. § 2201(a) requesting judgment declaring the rights of

10  SCOTTSDALE with respect to an actual controversy arising under

11  liability insurance policies.

12                    **THE DOE DEFENDANTS**

13      5.   Plaintiff SCOTTSDALE is unaware of the true identity,

14  nature and capacity of each of the defendants designated herein

15  as DOES 1 through 50 (hereinafter the "Doe Defendants").

16  Plaintiff SCOTTSDALE is informed and believes and thereon alleges

17  that DOES 1 through 50 are third parties interested in the

18  proceeds of the subject insurance policies (if any) or in

19  plaintiff SCOTTSDALE's and/or defendant Admiral's obligations (if

20  any) to provide Hawkins Enterprises, Inc./Hawkins Pool And

21  Innovative Design And Consulting ("HAWKINS") with a defense

22  against and/or indemnity in the action *Hamill v. Avante Canyon*

23  *Group, Inc. et al.*, County of Contra Costa Superior Court, Case

24  No. C06 02444.  Upon learning the true identity, nature and

25  capacity of the DOE Defendants, plaintiff SCOTTSDALE will amend

26  this Complaint to allege their true names and capacities.

27      6.   Plaintiff SCOTTSDALE is informed and believes and

28  thereon alleges that, at all material times herein alleged, the

2

**COMPLAINT FOR DECLARATORY RELIEF, EQUITABLE CONTRIBUTION AND INDEMNITY**

1  defendants, including the DOE Defendants, and each of them, were

2  the agents, servants, employees, members, associates,

3  shareholders, officers, directors, joint venturers, and/or alter

4  egos of the other defendants, and each of them.

FACTUAL BACKGROUND

**The Underlying *Hamill* Action**

7.  On December 1, 2006, a Complaint was filed in the
lawsuit entitled *Hamill v. Avante Canyon Group, Inc. et al.*,
County of Contra Costa Superior Court, Case No. C06 02444 (the
"*Hamill* Action"). HAWKINS was named as a defendant in the *Hamill*
Action. A true and correct copy of the *Hamill* Action Complaint
is attached hereto as **Exhibit I**, and the allegations contained
therein are incorporated by reference as though alleged herein in
full.

8.  The *Hamill* Action alleged that Avante Canyon Group,
Inc., dba Canyon Construction ("AVANTE") contracted with the
*Hamill* Action plaintiffs to do the pool and retaining wall work.
AVANTE allegedly subcontracted some of the pool work to HAWKINS.

9.  The *Hamill* Action Complaint alleged, in relevant part,
that HAWKINS negligently designed and/or installed a pool at the
*Hamill* Action plaintiffs' residence located at 2012 Las Trampas,
Alamo, California (the "Project"). The pool allegedly leaked,
causing and facilitating earth movement at the Project which
destabilized the pool and resulted in property damage to a
retaining wall installed by AVANTE. The leaks also allegedly
damaged flat work and resulted in loss of use of a material
portion of the Project. The *Hamill* Action plaintiffs allegedly
retained consultants to investigate and repair the conditions as

3

1    a result of HAWKINS' and AVANTE's negligence.  The subject pool

2    was allegedly a replacement pool.

3         10.  The *Hamill* Action plaintiffs alleged the pool

4    construction began in or about August, 2002 and was completed in

5    or about May, 2003.  A theory advanced by the plaintiffs and

6    experts in the *Hamill* Action is that the Project's site

7    experienced, before and throughout the pool construction, ongoing

8    subsurface creeping or earth movement that caused or contributed

9    to property damage to the pool, which then leaked.  The leaks

10   allegedly compounded the existing subsurface creeping issues and

11   added further instability.  Therefore, the *Hamill* Action alleged

12   that property damage was ongoing throughout at least the duration

13   of the pool construction, from about August, 2002 to about May,

14   2003 and later.

15   SCOTTSDALE's Defense Of HAWKINS

16        11.  Plaintiff SCOTTSDALE issued Commercial General

17   Liability Policy Numbers CLS0917677 and CLS1003593 (hereinafter

18   the "Scottsdale Policies") to named insured HAWKINS.  The

19   Scottsdale Policies were effective from April 14, 2003 to April

20   14, 2004 and April 14, 2004 to April 14, 2005, respectively.

21        12.  HAWKINS tendered defense and/or indemnity of the *Hamill*

22   Action to SCOTTSDALE under insurance policies that SCOTTSDALE

23   issued to HAWKINS.  SCOTTSDALE accepted the tender pursuant to

24   several reservations of rights.

25   ADMIRAL Refuses To Defend HAWKINS

26        13.  Plaintiff SCOTTSDALE is informed and believes and

27   thereon alleges that defendant ADMIRAL issued a Commercial

28   General Liability Policy (hereinafter the "Admiral Policy") to

4

155607.1 380.25686

named insured HAWKINS which was effective from April 14, 2002 to April 14, 2003.  Plaintiff SCOTTSDALE is informed and believes and thereon alleges that there may be other insurance policies issued by ADMIRAL and not identified herein which may be applicable to this matter.

14.  On or about December 15, 2005, HAWKINS tendered defense and/or indemnity of the *Hamill* plaintiffs' claim to defendant ADMIRAL under insurance policies ADMIRAL issued to HAWKINS. ADMIRAL declined the tender.

15.  Plaintiff SCOTTSDALE is informed and believes and thereon alleges that on or before October 16, 2007, HAWKINS' defense and indemnity in the *Hamill* Action was re-tendered to ADMIRAL.

16.  Plaintiff SCOTTSDALE is informed and believes and thereon alleges that on or about April 22, 2008, ADMIRAL's coverage counsel, Jerry Garcia of Lewis Brisbois Bisgaard & Smith, informed SCOTTSDALE that ADMIRAL was reconsidering its initial denial of coverage.

17.  On June 12, 2008, plaintiff SCOTTSDALE followed-up with Mr. Garcia in writing, requesting again that ADMIRAL accept HAWKINS' tender and defend HAWKINS in the *Hamill* Action as property damage is alleged within the Admiral Policy period.

18.  Plaintiff SCOTTSDALE is informed and believes and thereon alleges that to date, ADMIRAL has not responded to HAWKINS' re-tenders, thus its prior denial remains in effect.

19.  SCOTTSDALE has been and is defending HAWKINS in the *Hamill* Action.

///

COMPLAINT FOR DECLARATORY RELIEF, EQUITABLE CONTRIBUTION AND INDEMNITY

1    20.  Defendant ADMIRAL is not participating in the defense

2  of HAWKINS in the *Hamill* Action.

3                     FIRST CAUSE OF ACTION

4                     (Declaratory Relief)

5    21.  Plaintiff re-alleges paragraphs 1 through 20 and

6  incorporate them by reference herein.

7    22.  Plaintiff SCOTTSDALE contends that defendants ADMIRAL

8  and the Doe Defendants, and each of them, has an obligation to

9  defend and potentially indemnify HAWKINS in the *Hamill* Action

10  under their respective insurance policies.

11    23.  Plaintiff SCOTTSDALE contends that defendants ADMIRAL

12  and the Doe Defendants, and each of them, deny they had or have

13  an obligation to defend and potentially indemnify HAWKINS in the

14  *Hamill* Action under the terms of their respective insurance

15  policies.

16    24.  An actual controversy has arisen and now exists between

17  plaintiff SCOTTSDALE, on the one hand, and defendants ADMIRAL and

18  the Doe Defendants, and each of them, on the other hand,

19  regarding the duties and rights of defendants ADMIRAL and the Doe

20  Defendants, and each of them, under their respective insurance

21  policies with respect to coverage for the *Hamill* Action claims.

22    25.  This Court is vested with the power in the instant case

23  and plaintiff SCOTTSDALE hereby respectfully requests a judicial

24  determination and declaratory judgment of defendant ADMIRAL's

25  duties and rights under the ADMIRAL Policy, and any other

26  policies issued by ADMIRAL that may be applicable, with respect

27  to the duty to defend and indemnify HAWKINS in the *Hamill* Action.

28  Plaintiff SCOTTSDALE also respectfully requests a judicial

6

155607.1 380.25686

1    determination and declaratory judgment of the duties and rights

2    of the Doe Defendants, and each of them, under their respective

3    insurance policies, with respect to the duty to defend and

4    indemnify HAWKINS in the *Hamill* Action.  Such a judicial

5    declaration is necessary and appropriate at this time given the

6    above-stated controversy between plaintiff SCOTTSDALE and

7    defendants ADMIRAL and the Doe Defendants.

8                      SECOND CAUSE OF ACTION

9              (Equitable Contribution - Defense Expenses)

10       26.  Plaintiff re-alleges paragraphs 1 through 25 and

11   incorporate them by reference herein.

12       27.  Plaintiff SCOTTSDALE contends that under the Scottsdale

13   Policies it has been and is defending, under a full reservation

14   of rights, HAWKINS in the *Hamill* Action.  In so defending,

15   plaintiff SCOTTSDALE has incurred and continues to incur defense

16   costs and attorney's fees.

17       28.  Plaintiff SCOTTSDALE contends that defendants ADMIRAL

18   and the Doe Defendants, and each of them, owe its insured,

19   HAWKINS, a duty to defend against the *Hamill* Action by virtue of

20   their respective insurance policies.

21       29.  Plaintiff SCOTTSDALE contends that under the ADMIRAL

22   Policy, and any other applicable insurance policies issued by

23   ADMIRAL, ADMIRAL had and has an obligation to, but has not,

24   defended HAWKINS in the *Hamill* Action.  Plaintiff SCOTTSDALE

25   contends that defendant ADMIRAL had and has an obligation to

26   defend HAWKINS in the *Hamill* Action from the date ADMIRAL

27   received actual or constructive notice of the *Hamill* Action

28   ///

                              7

1  Complaint, which date SCOTTSDALE contends was on or before

2  October 16, 2007.

3      30.  A portion of HAWKINS' defense expenses, including

4  attorney's fees and costs, in the *Hamill* Action should be borne

5  by defendant ADMIRAL.

6      31.  Having contributed to the defense expenses for HAWKINS

7  in the *Hamill* Action, of which a portion should have been paid by

8  Defendant ADMIRAL, plaintiff SCOTTSDALE is entitled to recover

9  defense expenses from defendant ADMIRAL.

10     32.  Plaintiff SCOTTSDALE contends that SCOTTSDALE paid and

11 is paying more than its fair share of HAWKINS' defense in the

12 *Hamill* Action.  Having paid and paying more than its equitable

13 share and under the doctrine of equitable contribution, plaintiff

14 SCOTTSDALE contends that SCOTTSDALE is entitled to equitable

15 reimbursement from defendant ADMIRAL of a portion of the

16 litigation expenses, including attorney's fees and costs, which

17 SCOTTSDALE has already incurred, as well as for the attorney's

18 fees and defense costs which it will incur subsequent to the

19 filing of this Complaint, in defending HAWKINS' in the *Hamill*

20 Action.  Plaintiff SCOTTSDALE is also entitled to the legal rate

21 of interest on such amount and costs.  The litigation expenses

22 incurred by plaintiff SCOTTSDALE and owed by defendant ADMIRAL

23 represent sums certain which can be calculated and evidence

24 entered thereon at the time of trial.

25     33.  Plaintiff SCOTTSDALE is entitled to a money judgment

26 against defendants ADMIRAL and the Doe Defendants, and each of

27 them, for the amount of reimbursement and interest which is

28 equitable and according to proof.

### THIRD CAUSE OF ACTION

### (Equitable Contribution - Indemnification Amounts)

34. Plaintiff re-alleges paragraphs 1 through 33 and incorporate them by reference herein.

35. Plaintiff SCOTTSDALE contends that under the Scottsdale Policies it has and is defending, under a full reservation of rights, HAWKINS in the *Hamill* Action. In so defending, plaintiff SCOTTSDALE may either settle the action or otherwise incur more than its fair share of the indemnity payments.

36. Plaintiff SCOTTSDALE contends that defendants ADMIRAL and the Doe Defendants, and each of them, owe its insured, HAWKINS, indemnity should damages be awarded against HAWKINS in the *Hamill* Action.

37. Should SCOTTSDALE contribute to HAWKINS' indemnification in the *Hamill* Action, of which a portion should have been paid by defendant ADMIRAL, plaintiff SCOTTSDALE is entitled to recover a portion of the settlement proceeds or indemnity payments from defendant ADMIRAL.

38. Plaintiff SCOTTSDALE contends that because defendants ADMIRAL and the Doe Defendants, and each of them, refused and is refusing to defend HAWKINS, should SCOTTSDALE contribute to HAWKINS' indemnification in the *Hamill* Action, it will be more than SCOTTSDALE's fair share. Having paid more than its equitable share and under the doctrine of equitable contribution, plaintiff SCOTTSDALE contends that SCOTTSDALE would be entitled to equitable reimbursement from defendant ADMIRAL of a portion of the indemnification paid on HAWKINS' behalf in the *Hamill* Action. Plaintiff SCOTTSDALE is also entitled to the legal rate of

9

155607.1 380.25686

interest on such amount and costs.  The indemnification that may be incurred by plaintiff SCOTTSDALE and owed by defendant ADMIRAL represent sums or percentages certain which can be calculated and evidence entered thereon at the time of trial.

39.  Plaintiff SCOTTSDALE is entitled to a money judgment against defendants ADMIRAL and the Doe Defendants, and each of them, for the amount of reimbursement and interest which is equitable and according to proof.

**FOURTH CAUSE OF ACTION**

**(Indemnity - Defense Expenses)**

40.  Plaintiff re-alleges paragraphs 1 through 39 and incorporate them by reference herein.

41.  Plaintiff SCOTTSDALE suffered a loss for which defendants ADMIRAL and the Doe Defendants, and each of them, are liable because these defendants, and each of them, are responsible to the mutual insured, HAWKINS, for the loss as provided for in their respective insurance policies.

42.  Plaintiff SCOTTSDALE has provided its insured, HAWKINS, with a defense against the *Hamill* Action for which defendants ADMIRAL and the Doe Defendants, and each of them, are liable.

43.  In making such payments, plaintiff SCOTTSDALE did not act as a volunteer.

44.  Plaintiff SCOTTSDALE has suffered damages caused by the acts and/or omissions of defendants ADMIRAL and the Doe Defendants, and each of them.

45.  Plaintiff SCOTTSDALE is entitled to recover the legal rate of interest on such loss and damages.

10

155607.1 380.25686

46. Justice requires that the loss, including interest, be shifted from plaintiff SCOTTSDALE to defendants ADMIRAL and the Doe Defendants, and each of them, whose equitable position is inferior to that of plaintiff SCOTTSDALE.

## FIFTH CAUSE OF ACTION

### (Indemnity - Indemnification Amounts)

47. Plaintiff re-alleges paragraphs 1 through 46 and incorporate them by reference herein.

48. Plaintiff SCOTTSDALE may suffer a loss for which defendants ADMIRAL and the Doe Defendants, and each of them, are liable because these defendants, and each of them, are responsible to the mutual insured, HAWKINS, for the loss as provided for in their respective insurance policies.

49. Plaintiff SCOTTSDALE may settle the *Hamill* Action or otherwise indemnify its insured, HAWKINS, for judgment should one be rendered in the *Hamill* Action for which defendants ADMIRAL and the Doe Defendants, are liable.

50. In making such payments, plaintiff SCOTTSDALE will not be acting as a volunteer.

51. Plaintiff SCOTTSDALE will suffer damages caused by the acts and/or omissions of defendants ADMIRAL and the Doe Defendants, and each of them.

52. Plaintiff SCOTTSDALE is entitled to recover the legal rate of interest on such loss and damages.

53. Justice requires that the loss, including interest, be shifted from plaintiff SCOTTSDALE to defendants ADMIRAL and the

///

11

155607.1 380.25686

1   Doe Defendants, and each of them, whose equitable position is

2   inferior to that of plaintiff SCOTTSDALE.

3

4                       **PRAYER FOR RELIEF**

5        **WHEREFORE**, plaintiff SCOTTSDALE prays for judgment

6   against defendants, and each of them, as follows:

7               **AS TO THE FIRST CAUSE OF ACTION**

8        1.   That the Court declare:

9             (a)  Defendants ADMIRAL and the Doe Defendants, and

10  each of them, are obligated under their respective insurance

11  policies to provide HAWKINS with a defense against the *Hamill*

12  Action.

13            (b)  Defendants ADMIRAL and the Doe Defendants, and

14  each of them, are obligated under their respective insurance

15  policies to indemnify HAWKINS for a judgment should be one

16  rendered against them in the *Hamill* Action.

17            (c)  For the costs of suit incurred herein; and

18            (d)  For such other relief as this Court may deem just

19  and proper.

20          **AS TO THE SECOND AND THIRD CAUSES OF ACTION**

21       2.   For equitable contribution against defendants ADMIRAL

22  and the Doe Defendants, according to proof, including judgment

23  against said defendants for any and all amounts due to plaintiff

24  SCOTTSDALE.

25          **AS TO THE FOURTH AND FIFTH CAUSES OF ACTION**

26       3.   For indemnification against defendants ADMIRAL and the

27  Doe Defendants, according to proof, including judgment against

28  ///

                               12

155607.1 380.25686

1    said defendants for any and all amounts due to plaintiff

2    SCOTTSDALE.

3                    **AS TO ALL CAUSES OF ACTION**

4        4.    For costs of suit and attorney's fees incurred herein;

5        5.    For interest on all damages at the legal rate from the

6    date first allowed by law; and

7        6.    For all such other and further relief as the Court

8    deems just and proper.

9                        **JURY DEMAND**

10       Plaintiff SCOTTSDALE hereby makes a request for trial by

11   jury.

12

13   DATED: August 18, 2008      SELMAN BREITMAN LLP

14

15                          By: _____

16                              LINDA WENDELL HSU  (SBN 162971)
                                LISA A. WILSON    (SBN 190392)
17                              Attorneys for Plaintiff
                                SCOTTSDALE INSURANCE COMPANY

18

19

20

21

22

23

24

25

26

27

28

                              13
        COMPLAINT FOR DECLARATORY RELIEF, EQUITABLE CONTRIBUTION AND INDEMNITY

**EXHIBIT I**

Page 3 of 39 Received on 12/6/2006 2:17:10 PM [US Mountain Standard Time]

1  PETER V. DESSAU, ESQ., SBN 135361
2  ANGELA F. STOREY, ESQ., SBN 217942
   MILLER, MORTON, CAILLAT & NEVIS, LLP
3  25 Metro Drive, 7th Floor
   San Jose, California 95110
4  Telephone: (408) 292-1765
   Facsimile: (408) 436-8272
5
   Attorneys for Plaintiffs STEPHEN HAMILL and
6  JANICE HAMILL
7
8
9                SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                      COUNTY OF CONTRA COSTA

11  STEPHEN HAMILL and JANICE HAMILL,    )  Case No.:  C 06    02444
    husband and wife,                    )
12                                        )
                                          )
13              Plaintiffs,               )  COMPLAINT FOR BREACH OF
                                          )  CONTRACT; BREACH OF WARRANTY;
14        vs.                             )  PROFESSIONAL NEGLIGENCE; AND
                                          )  NEGLIGENCE
15  AVANTE CANYON GROUP, INC., dba        )
    CANYON CONSTRUCTION; STEPHEN          )
16  DEJESSE, an individual;               )
    INGRAHAM/DEJESSE ASSOCIATES, INC.,)
17  a California corporation; JENSEN-VAN  )  Amount Demanded Exceeds $10,000
    LIENDEN ASSOCIATES, INC., a California)  Unlimited Civil Case
18  corporation; CURTIS JENSEN, an individual; )
    HAWKINS ENTERPRISES, INC., a          )
19  California corporation; and DOES 1 through )
20  40, inclusive,                        )  PER LOCAL RULE 5 THIS
                                          )  CASE IS ASSIGNED TO
21                                        )  DEPT ____ 06 _____
              Defendants.                 )
22  _____)

23       Plaintiffs, STEPHEN HAMILL and JANICE HAMILL, allege as follows:
24                      GENERAL ALLEGATIONS
25       1.    Plaintiffs STEPHEN HAMILL and JANICE HAMILL (hereinafter "Plaintiffs" or
26  the "HAMILLS") are, and at all times relevant herein were, husband and wife, with their
27  principal place of residence in the City of Alamo, Contra Costa County, State of California.
28  ///

1
COMPLAINT FOR BREACH OF CONTRACT; PROFESSIONAL NEGLIGENCE; AND NEGLIGENCE

2.    The subject of this action is the improvements at the real property located at 2012 Las Trampas, in Alamo, California. This property is the residence of the Plaintiffs and shall hereinafter be referred to as the "Project." The residence had a recent history of earth movement. The purpose of the improvements was to repair and prevent future damage at the Project.

3.    Plaintiffs are informed and believe, and on that basis allege, that Defendant AVANTE CANYON GROUP, INC., dba CANYON CONSTRUCTION, is, and at all times relevant herein was, a California corporation, with its principal place of business in Moraga, California.

4.    Plaintiffs are informed and believe, and on that basis allege, that Defendant STEPHEN DEJESSE is an individual, residing in Oakland, California.

5.    Plaintiffs are informed and believe, and on that basis allege, that Defendant INGRAHAM/DEJESSE ASSOCIATES, INC., is either a corporation duly authorized to do business, and doing business, in the State of California, or, in the alternative, is a sole proprietorship or partnership, joint venture, or association of two (2) or more individuals doing business under a common name. This Defendant is sued herein by its common name pursuant to the Code of Civil Procedure §388. Plaintiff prays leave to amend this Complaint when the true nature of this entity has been ascertained.

6.    Plaintiffs are informed and believe, and on that basis allege, that Defendant JENSEN-VAN LIENDEN ASSOCIATES, INC., a California corporation, is, and at all times relevant herein was, a California corporation, with its principal place of business in Berkeley, California.

7.    Plaintiffs are informed and believe, and on that basis allege, that Defendant CURTIS JENSEN is an individual, residing in Berkeley, California.

8.    Plaintiffs are informed and believe, and on that basis allege, that Defendant HAWKINS ENTERPRISES, INC., a California corporation, is, and at all times relevant herein was, a California corporation, with its principal place of business in Danville, California.

///

MILLER, MORTON, CAILLAT & NEVIS, LLP
25 Metro Drive, 7th Floor
San Jose, CA 95110
Telephone: (408) 292-1765

2

Page 6 of 39 Received on 12/6/2006 2:17:10 PM [US Mountain Standard Time]

9. Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 40, inclusive and therefore sue these Defendants by such fictitious names. Plaintiffs pray leave to amend this Complaint to allege their true names and capacities when the same have been ascertained.

10. Plaintiffs are informed and believe, and thereon allege that each of the Defendants sued herein is responsible in some manner for the occurrences herein alleged, and that Plaintiffs' damages, as herein alleged, were proximately caused by such Defendants.

11. Plaintiffs are informed and believe, and thereon allege that at all times herein mentioned each of the Defendants sued herein was the agent or employee of each of the remaining Defendants, and was, at all times, acting within the purpose and scope of such agency or employment.

12. All conditions complained of herein were either discovered within two years of the filing of this action, tolled pursuant to a written tolling agreement with the parties herein, or both.

## FIRST CAUSE OF ACTION

[Breach of Written Contract

Against AVANTE CANYON GROUP, INC., dba CANYON CONSTRUCTION,

and DOES 1 through 5, inclusive]

13. Plaintiffs hereby reallege and incorporate herein by this reference each and every allegation contained in Paragraphs 1 through 12, inclusive, of their Complaint, as though fully set forth herein.

14. Plaintiffs entered a written contract with AVANTE CANYON GROUP, INC., dba CANYON CONSTRUCTION ("AVANTE"), wherein AVANTE agreed to perform repairs to a retaining wall located on the property, as well as to replace a pool. Attached hereto as Exhibit "A" is a true and correct copy of the contract. Pursuant to the terms of the contract, AVANTE promised that the work would be "free from defects" and that it would supervise and direct the work using its best skill and attention. Furthermore, AVANTE agreed that it would be responsible for the acts and omissions of its subcontractors.

MILLER MORTON CAILLAT & NEVIS, LLP
25 Metro Drive, 7th Floor
San Jose, CA  95110
Telephone: (408) 292-1765

3

Page 7 of 39 Received on 12/6/2006 2:17:10 PM [US Mountain Standard Time]

15.    Plaintiffs have performed all conditions, covenants and promises required on their part to be performed in accordance with the terms and conditions of the prime contract, except for those promises and obligations which were otherwise excused, satisfied or discharged as a matter of law.

16.    AVANTE and DOES 1 through 5, inclusive, and each of them, breached the prime contract by, among other things, failing to install a pool in a reasonable and workmanlike manner in accordance with the Contract Documents.

17.    As a result of Defendants' breach of the prime contract, Plaintiffs have been damaged. Specifically, leaks in the pool proximately caused and facilitated earth movement at the Project which has destabilized the pool and resulted in tangible property damage to a retaining wall that was also installed by AVANTE. The leaks caused damage to flat work at the Project and resulted in the loss of use of a material portion of the Project. Finally, Plaintiffs have retained consultants to investigate the conditions and to generate repairs for the conditions at the Project as a result of the aforementioned breach.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as hereinafter set forth.

<u>SECOND CAUSE OF ACTION</u>

[Breach of Express Warranty

Against AVANTE and DOES 1 through 5, inclusive]

18.    Plaintiffs hereby reallege and incorporate herein by this reference each and every allegation contained in Paragraphs 1 through 17, inclusive, of their Complaint, as though fully set forth herein.

19.    AVANTE and DOES 1 through 5 expressly warranted that its work would be free from defects. The work of AVANTE, and DOES 1 through 5, inclusive, is not free from defects.

20.    As a result of Defendants' breach of warranty, Plaintiffs have been damaged. Specifically, leaks in the pool proximately caused earth movement at the back of the property which has destabilized the pool and resulted in tangible property damage to a retaining wall that was also installed by AVANTE. The leaks caused damage to flat work at the Project and

MILLER, MORTON, CAILLAT & NEVIS, LLP
25 Metro Drive, 7th Floor
San Jose, CA 95110
Telephone (408) 292-1765

4

COMPLAINT FOR BREACH OF CONTRACT; PROFESSIONAL NEGLIGENCE; AND NEGLIGENCE

Page 8 of 39 Received on 12/6/2006 2:17:10 PM [US Mountain Standard Time]

1    resulted in the loss of use of a material portion of the Project. Finally, Plaintiffs have retained

2    consultants to investigate the conditions and to generate repairs for the conditions at the Project

3    as a result of the aforementioned breach of warranty.

4         WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as

5    hereinafter set forth.

6                          THIRD CAUSE OF ACTION

7         [Negligence Against AVANTE, HAWKINS ENTERPRISES, INC.,

8              and DOES 1 through 20, inclusive]

9         21.    Plaintiffs hereby reallege and incorporate herein by this reference each and every

10   allegation contained in Paragraphs 1 through 20, inclusive, of their Complaint, as though fully

11   set forth herein.

12        22.    Plaintiffs are informed and believe, and thereon allege, that HAWKINS

13   ENTERPRISES, INC. ("HAWKINS") entered a subcontract with AVANTE wherein

14   HAWKINS agreed to design and install a pool at the Project.

15        23.    HAWKINS is a swimming pool contractor and holds a C53 license from the

16   California State Contractors License Board.

17        24.    HAWKINS owed Plaintiffs a duty of care to designed and/or install the pool

18   properly and professionally.

19        25.    Hawkins breached its duty of care. It either negligently designed or installed the

20   pool, because the pool leaked.

21        26.    AVANTE owed Plaintiffs a duty care in supervising and inspecting, coordinating

22   and inspecting HAWKINS' work.

23        27.    AVANATE breached its duty of care. HAWKINS negligently installed the pool

24   and it leaked.

25        28.    As a result of Defendants' negligence, Plaintiffs have been damaged.

26   Specifically, leaks in the pool proximately caused and facilitated earth movement at the Project

27   which has destabilized the pool and resulted in tangible property damage to a retaining wall that

28   was also installed by AVANTE. The leaks caused damage to flat work at the Project and

MILLER, MORTON, CAILLAT & NEVIS, LLP
25 Metro Drive, 7th Floor
San Jose, CA 95110
Telephone: (408) 292-1765

                                5

Page 9 of 39 Received on 12/6/2006 2:17:10 PM [US Mountain Standard Time]

resulted in the loss of use of a material portion of the Project. Finally, Plaintiffs have retained consultants to investigate the conditions and to generate repairs for the conditions at the Project as a result Defendants' negligence.

29.   Plaintiffs are entitled to attorneys' fees against HAWKINS pursuant to California Civil Code Section 7167.5.

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as hereinafter set forth.

## FOURTH CAUSE OF ACTION

[Breach of Contract Against JENSEN-VAN LIENDEN ASSOCIATES, INC., and DOES 21 through 30, inclusive]

30.   Plaintiffs hereby reallege and incorporate herein by this reference each and every allegation contained in Paragraphs 1 through 29, inclusive, of their Complaint, as though fully set forth herein.

31.   JENSEN-VAN LIENDEN ASSOCIATES, INC. ("JVL") and Plaintiffs entered an oral agreement whereby JVL agreed to provide professional engineering services in connection with the design and installation of a retaining wall at the property. Specifically, JVL agreed to provide geotechnical engineering services to facilitate the specific design and installation of the retaining wall at the Project. Implied in the contract with JVL was its promise that it would provide its services with skill, care and to the highest professional standards.

32.   Plaintiffs are informed and believe and based thereon allege that JVL breached the oral agreement.

33.   As a result of Defendants' breach of contract, Plaintiffs have been damaged. Specifically, the earth movement at the back of the property has destabilized the pool, damaged the retaining wall, caused damage to flat work at the Project and resulted in the loss of use of a material portion of the Project. Finally, Plaintiffs have retained consultants to investigate the conditions and to generate repairs for the conditions at the Project as a result of the aforementioned breach.

///

MILLER, MORTON, CAILLAT & NEVIS, LLP
25 Metro Drive, 7th Floor
San Jose, CA 95110
Telephone: (408) 292-1765

6

COMPLAINT FOR BREACH OF CONTRACT; PROFESSIONAL NEGLIGENCE; AND NEGLIGENCE

Page 10 of 39 Received on 12/6/2006 2:17:10 PM [US Mountain Standard Time]

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as hereinafter set forth.

<u>FIFTH CAUSE OF ACTION</u>

[Breach of Contract Against INGRAHAM DEJESSE ASSOCIATES, INC,

and DOES 31 through 40, inclusive]

34.    Plaintiffs hereby reallege and incorporate herein by this reference each and every allegation contained in Paragraphs 1 through 33, inclusive, of their Complaint, as though fully set forth herein.

35.    Plaintiff entered a written contract with INGRAHAM DEJESSE ASSOCIATES, INC. ("IDA") and DOES 31-40 and Plaintiffs IDA agreed to provide structural engineering services in connection with the design and installation of certain works of improvement at the property. Specifically, IDA and DOES 31-40 agreed to provide engineering services to design a retaining wall at the Project. Implied in the agreement was a promise that IDA would perform these services pursuant to the standard of care for architects performing similar work in the community. A true and correct copy of the agreement is attached hereto as Exhibit B.

36.    Plaintiffs are informed and believe and based thereon allege that IDA and DOES 31-40 breached the contract.

37.    As a result of Defendants' breach of contract, Plaintiffs have been damaged. Specifically, the earth movement at the back of the property has destabilized the pool, damaged the retaining wall, caused damage to flat work at the Project and resulted in the loss of use of a material portion of the Project. Finally, Plaintiffs have retained consultants to investigate the conditions and to generate repairs for the conditions at the Project as a result of the aforementioned breach.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as hereinafter set forth.

///

///

///

MILLER, MORTON, CAILLAT & NEVIS, LLP
25 Metro Drive, 7th Floor
San Jose, CA 95110
Telephone: (408) 292-1765

7

## SIXTH CAUSE OF ACTION

[Negligence Against JVL, CURTIS JENSEN, IDA
and DOES 21 through 40, inclusive]

38.    Plaintiffs hereby reallege and incorporate herein by this reference each and every allegation contained in Paragraphs 1 through 37, inclusive, of their Complaint, as though fully set forth herein.

39.    Defendants, JVL, CURTIS JENSEN, IDA and DOES 21 through 40 and each of them, owed Plaintiffs a duty of care to undertake their professional services in a manner consistent with professional standards of care.

40.    Plaintiffs are informed and believe and based thereon allege that Defendants JVL, CURTIS JENSEN, IDA and DOES 21 through 40, and each of them, breached their respective duties of care to provide architectural and engineering services by failing to generate a design for the Project that would result in a stable and permanent set of real property improvements suited for the conditions at the site.

41.    As a result of Defendants' negligence, Plaintiffs have been damaged. Specifically, the earth movement at the back of the property has destabilized the pool, damaged the retaining wall, caused damage to flat work at the Project and resulted in the loss of use of a material portion of the Project. Finally, Plaintiffs have retained consultants to investigate the conditions and to generate repairs for the conditions at the Project as a result of the aforementioned breach.

Wherefore, Plaintiffs pray for judgment as follows.

## PRAYER

ON ALL CAUSES OF ACTION:

1.    For damages according to proof;

2.    For cost of suit herein incurred;

3.    For such other relieve as the Court deems just and proper;

///

///

MILLER, MORTON, CAILLAT & NEVIS, LLP
25 Metro Drive, 7th Floor
San Jose, CA 95110
Telephone: (408) 292-1765

8

ON THE THIRD CAUSE OF ACTION:

    4.    For attorneys fees and costs.

Dated: December ___/___, 2006      MILLER, MORTON, CAILLAT & NEVIS, LLC

                By: _____
                     PETER V. DESSAU
                     Attorneys for Plaintiffs STEPHEN HAMILL and
                     JANICE HAMILL

::ODMA\GRPWISE\MMCN_SJDOMAIN.MMCN_SJPO.NewLitigationLibrary:17805.1

MILLER, MORTON, CAILLAT & NEVIS, LLP
25 Metro Drive, 7th Floor
San Jose, CA 95110
Telephone: (408) 292-1765

9

COMPLAINT FOR BREACH OF CONTRACT; PROFESSIONAL NEGLIGENCE; AND NEGLIGENCE

Page 13 of 39 Received on 12/6/2006 2:17:10 PM [US Mountain Standard Time]

# EXHIBIT A

Page 14 of 39 Received on 12/6/2006 2:17:10 PM [US Mountain Standard Time]

*AIA Document A131/CMc and AGC Document 566*

# Standard Form of Agreement Between Owner and Construction Manager

*where the Construction Manager is also THE CONSTRUCTOR; and where the Basis of Payment is the Cost of the Work Plus a Fee and there is no Guarantee of Cost.*

## 1994 EDITION

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES; CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION.*

*The 1987 Edition of AIA Document A201, General Conditions of the Contract for Construction, is referred to herein. This Agreement requires modification if other general conditions are utilized.*

---

## AGREEMENT

made as of the ░░░Tenth░░░ day of ░░May░░ in the year of
*(In words, indicate day, month and year)*
░░Two Thousand and Two░░

**BETWEEN** the Owner:
*(Name and address)*

Steve and Jan Hamill
2012 Las Trampas
Alamo, CA  94507

and the Construction Manager:
*(Name and address)*

Canyon Construction
1635 School Street   Suite 105
Moraga, CA  94556

The Project is:
*(Name, address and brief description)*

Retaining Wall Repair and Pool Replacement
2012 Las Trampas
Alamo, CA  94507

The Architect is:
*(Name and address)*

Ingraham DeJesse Associates, Inc.
825 Page Street   First Floor
Berkeley, CA  94710

The Owner and Construction Manager agree as set forth below.

---

Portions of this document are derived from AIA Document A111, Standard Form of Agreement Between the Owner and Contractor where the basis of payment is the Cost of the Work Plus a Fee, copyright 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, ©1987 by The American Institute of Architects; other portions are derived from AGC Document 500, ©1980 by The Associated General Contractors of America. Material in this document differing from that found in AIA Document A111 and AGC Document 500 is copyrighted ©1994 by The American Institute of Architects and The Associated General Contractors of America. Reproduction of the material herein or substantial quotation of its provisions without written permission of AIA and AGC violates the copyright laws of the United States and will subject the violator to legal prosecution.

 

AIA DOCUMENT A131/CMc AND AGC DOCUMENT 566 • OWNER-CONSTRUCTION MANAGER AGREEMENT
• 1994 EDITION • ©1994 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W.,
WASHINGTON, D.C. 20006-5292 • AGC • ©1994 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA,
1957 E STREET, N.W., WASHINGTON, D.C. 20006 • **WARNING: Unlicensed photocopying violates U.S.
copyright laws and will subject the violator to legal prosecution.**

**A131/CMc
AGC 566—1994   1**

Page 15 of 39 Received on 12/6/2006 2:17:10 PM [US Mountain Standard Time]

# TABLE OF CONTENTS

ARTICLE 1   GENERAL PROVISIONS

  1.1   Relationship of Parties
  1.2   General Conditions
  1.3   Contract Sum, Contract Time and
        Changes in the Work


ARTICLE 2   CONSTRUCTION MANAGER'S
            RESPONSIBILITIES

  2.1   Preconstruction Phase
  2.2   Control Estimate and Contract Time
  2.3   Construction Phase
  2.4   Professional Services
  2.5   Unsafe Materials


ARTICLE 3   OWNER'S RESPONSIBILITIES

  3.1   Information and Services
  3.2   Owner's Designated Representative
  3.3   Architect
  3.4   Legal Requirements


ARTICLE 4   COMPENSATION AND PAYMENTS
            FOR PRECONSTRUCTION PHASE
            SERVICES

  4.1   Compensation
  4.2   Payments


ARTICLE 5   COMPENSATION FOR
            CONSTRUCTION PHASE SERVICES

  5.1   Compensation
  5.2   Changes in the Work


ARTICLE 6   COST OF THE WORK FOR
            CONSTRUCTION PHASE

  6.1   Costs To Be Reimbursed
  6.2   Costs Not To Be Reimbursed
  6.3   Discounts, Rebates and Refunds
  6.4   Accounting Records

ARTICLE 7   CONSTRUCTION PHASE
            PAYMENTS

  7.1   Progress Payments
  7.2   Final Payment


ARTICLE 8   INSURANCE AND BONDS

  8.1   Insurance Required of the
        Construction Manager
  8.2   Insurance Required of the Owner
  8.3   Performance Bond and Payment Bond


ARTICLE 9   MISCELLANEOUS PROVISIONS

  9.1   Dispute Resolution for the
        Preconstruction Phase
  9.2   Dispute Resolution for the
        Construction Phase
  9.3   Other Provisions


ARTICLE 10  TERMINATION OR SUSPENSION

  10.1  Termination Prior to the Owner's
        Approval of the Control Estimate
  10.2  Termination Subsequent to the Owner's
        Approval of the Control Estimate
  10.3  Notice of Termination
  10.4  Suspension


ARTICLE 11  OTHER CONDITIONS AND
            SERVICES

A131/CMc

2   AGC 566—1994

AIA DOCUMENT A131/CMc AND AGC DOCUMENT 566 • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1994 EDITION
©1994 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292 • AGC
©1994 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C. 20006 •
WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

---

**STANDARD FORM OF AGREEMENT BETWEEN OWNER AND CONSTRUCTION MANAGER WHERE THE CONSTRUCTION MANAGER IS ALSO THE CONSTRUCTOR**

---

## ARTICLE 1
### GENERAL PROVISIONS

#### 1.1    RELATIONSHIP OF PARTIES

The Construction Manager accepts the relationship of trust and confidence established with the Owner by this Agreement, and covenants with the Owner to furnish the Construction Manager's reasonable skill and judgment and to cooperate with the Architect in furthering the interests of the Owner. The Construction Manager shall furnish construction administration and management services and use the Construction Manager's best efforts to perform the Project in an expeditious and economical manner consistent with the interests of the Owner. The Owner shall endeavor to promote harmony and cooperation among the Owner, Architect, Construction Manager and other persons or entities employed by the Owner for the Project.

#### 1.2    GENERAL CONDITIONS

For the Construction Phase, the General Conditions of the Contract shall be the 1987 Edition of AIA Document A201, General Conditions of the Contract for Construction, which is incorporated herein by reference and which shall apply except as specifically noted in this Agreement. For the Preconstruction Phase, including Preconstruction Phase activities which proceed concurrently with the Construction Phase, AIA Document A201 shall not apply except as specifically provided in this Agreement. If anything in AIA Document A201 is inconsistent with or is modified by this Agreement, this Agreement shall govern. Modifications of AIA Document A201 by this Agreement shall not apply to Subcontractors except as provided in Paragraph 2.5 of this Agreement. The term "Contractor" as used in AIA Document A201 shall mean the Construction Manager.

#### 1.3    CONTRACT SUM, CONTRACT TIME AND CHANGES IN THE WORK

The Contract Sum is the total Cost of the Work as described in Article 6, plus the Construction Manager's Fee as set forth in Article 5. The Contract Time is the duration from the date of commencement of the Construction Phase until the date of Substantial Completion. Changes in the Work shall be governed by Paragraph 5.2 of this Agreement and not by Article 7 of AIA Document A201. If, however, the Contract Time has been established in accordance with Clause 2.2.4.5 of this Agreement, adjustments to the Contract Time shall be made in accordance with Article 7 of AIA Document A201.

## ARTICLE 2
### CONSTRUCTION MANAGER'S RESPONSIBILITIES

The Construction Manager shall perform the services described in this Article. The services to be provided under Paragraphs 2.1 and 2.2 constitute the Preconstruction Phase services. If the Owner and Construction Manager agree, after

consultation with the Architect, the Preconstruction Phase may commence before the Preconstruction Phase is completed, in which case both phases will proceed concurrently.

#### 2.1    PRECONSTRUCTION PHASE

#### 2.1.1    PRELIMINARY EVALUATION

The Construction Manager shall provide a preliminary evaluation of the Owner's program, Project budget and schedule requirements, each in terms of the other.

#### 2.1.2    CONSULTATION

The Construction Manager with the Architect shall jointly schedule and attend regular meetings with the Owner and Architect. The Construction Manager shall consult with the Owner and Architect regarding site use and improvements, and the selection of materials, building systems and equipment. The Construction Manager shall provide recommendations on construction feasibility; actions designed to minimize adverse effects of labor or material shortages; time requirements for procurement, installation and construction completion; and factors related to construction cost including estimates of alternative designs or materials, preliminary budgets and possible economies.

#### 2.1.3    PRELIMINARY PROJECT SCHEDULE

When Project requirements described in Subparagraph 3.1.1 have been sufficiently identified, the Construction Manager shall prepare, and periodically update, a preliminary Project schedule for the Architect's review and the Owner's approval. The Construction Manager shall obtain the Architect's approval of the portion of the preliminary Project schedule relating to the performance of the Architect's services. The Construction Manager shall coordinate and integrate the preliminary Project schedule with the services and activities of the Owner, Architect and Construction Manager. As design proceeds, the preliminary Project schedule shall be updated to indicate proposed activity sequences and durations, milestone dates for receipt and approval of pertinent information, submittal of the Control Estimate, preparation and processing of shop drawings and samples, delivery of materials or equipment requiring long-lead time procurement, Owner's occupancy requirements showing portions of the Project having occupancy priority, and estimated date of Substantial Completion. If preliminary Project schedule updates indicate that previously approved schedules may not be met, the Construction Manager shall make appropriate recommendations to the Owner and Architect.

#### 2.1.4    PHASED CONSTRUCTION

The Construction Manager shall make recommendations to the Owner and Architect regarding the phased issuance of Drawings and Specifications to facilitate phased construction of the Work, if such phased construction is appropriate for the Project, taking into consideration such factors as economies, time of performance, availability of labor and materials, and provisions for temporary facilities.

---

AIA DOCUMENT A131/CMc AND AGC DOCUMENT 566 • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1994 EDITION ©1994 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292 • AGC ©1994 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C. 20006 • WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

### 2.1.5 PRELIMINARY COST ESTIMATES

**2.1.5.1** When the Owner has sufficiently identified the Project requirements and the Architect has prepared other basic design criteria, the Construction Manager shall prepare, for the review of the Architect and approval of the Owner, a preliminary cost estimate utilizing area, volume or similar conceptual estimating techniques.

**2.1.5.2** When Schematic Design Documents have been prepared by the Architect and approved by the Owner, the Construction Manager shall prepare for the review of the Architect and approval of the Owner, a more detailed estimate with supporting data. During the preparation of the Design Development Documents, the Construction Manager shall update and refine this estimate at appropriate intervals agreed to by the Owner, Architect and Construction Manager.

**2.1.5.3** When Design Development Documents have been prepared by the Architect and approved by the Owner, the Construction Manager shall prepare a detailed estimate with supporting data for review by the Architect and approval by the Owner. During the preparation of the Construction Documents, the Construction Manager shall update and refine this estimate at appropriate intervals agreed to by the Owner, Architect and Construction Manager.

**2.1.5.4** If any estimate submitted to the Owner exceeds previously approved estimates or the Owner's budget, the Construction Manager shall make appropriate recommendations to the Owner and Architect.

### 2.1.6 SUBCONTRACTORS AND SUPPLIERS

The Construction Manager shall seek to develop subcontractor interest in the Project and shall furnish to the Owner and Architect for their information a list of possible subcontractors, including suppliers who are to furnish materials or equipment fabricated to a special design, from whom proposals will be requested for each principal portion of the Work. The Architect will promptly reply in writing to the Construction Manager if the Architect or Owner know of any objection to such subcontractor or supplier. The receipt of such list shall not require the Owner or Architect to investigate the qualifications of proposed subcontractors or suppliers, nor shall it waive the right of the Owner or Architect later to object to or reject any proposed subcontractor or supplier.

### 2.1.7 LONG-LEAD TIME ITEMS

The Construction Manager shall recommend to the Owner and Architect a schedule for procurement of long-lead time items which will constitute part of the Work as required to meet the Project schedule. If such long-lead time items are procured by the Owner, they shall be procured on terms and conditions acceptable to the Construction Manager. Upon the Owner's approval of the Control Estimate, all contracts for such items shall be assigned by the Owner to the Construction Manager, who shall accept responsibility for such items as if procured by the Construction Manager. The Construction Manager shall expedite the delivery of long-lead time items.

### 2.1.8 EXTENT OF RESPONSIBILITY

The Construction Manager agrees to exercise reasonable skill and judgment in the preparation of schedules and estimates, but does not warrant or guarantee any schedules or estimates or line items within such estimates, even though approved by the Owner, including the Control Estimate and the estimated date of Substantial Completion, except as otherwise provided under Clause 2.2.4.5. The recommendations and advice of the Construction Manager concerning design alternatives shall be subject to the review and approval of the Owner and the Owner's professional consultants. It is not the Construction Manager's responsibility to ascertain that the Drawings and Specifications are in accordance with applicable laws, statutes, ordinances, building codes, rules and regulations. However, if the Construction Manager recognizes that portions of the Drawings and Specifications are at variance, the Construction Manager shall promptly notify the Architect and Owner in writing.

### 2.1.9 EQUAL EMPLOYMENT OPPORTUNITY AND AFFIRMATIVE ACTION

The Construction Manager shall comply with applicable laws, regulations and special requirements of the Contract Documents regarding equal employment opportunity and affirmative action programs.

### 2.2 CONTROL ESTIMATE AND CONTRACT TIME

**2.2.1** In accordance with the preliminary Project schedule established in Subparagraph 2.1.3, the Construction Manager shall prepare and submit to the Owner in writing a Control Estimate using current information to update the most recently prepared Preliminary Estimate. The Control Estimate shall be the sum of the then-estimated Cost of the Work and the Construction Manager's Fee, and is the estimate against which actual costs will be measured.

**2.2.2** The Construction Manager shall develop and implement a detailed system of cost control that will provide the Owner with timely information as to the anticipated total Cost of the Work. The cost control system shall compare the Control Estimate with the actual cost for activities in progress and estimates for uncompleted tasks and proposed changes. This information shall be reported to the Owner in writing at mutually agreeable intervals.

**2.2.3** As the Drawings and Specifications may not be finished at the time the Control Estimate is prepared, the Construction Manager shall provide in the Control Estimate for further development of the Drawings and Specifications by the Architect that is consistent with the Contract Documents and reasonably inferable therefrom. Such further development does not include such things as changes in scope, systems, kinds and quality of materials, finishes or equipment.

**2.2.4** The Control Estimate shall include:

.1 A list of the Drawings and Specifications, including all addenda thereto and the Conditions of the Contract.

.2 A list of the clarifications and assumptions made by the Construction Manager in the preparation of the Control Estimate to supplement the information contained in the Drawings and Specifications.

.3 A statement of the estimated Cost of the Work organized by trade categories or systems, and the Construction Manager's fee.

.4 A statement of the actual or estimated date of commencement of the Construction Phase and the estimated date of Substantial Completion, with a schedule of the construction documents issuance dates upon which the estimated date of Substantial Completion is based.

.5 A statement as to whether or not the duration from the stated date of commencement of the Construction Phase to the estimated date of Substantial Completion shall become the Contract Time and be subject to the provisions of Article 8 of AIA Document A201.

**A131/CMc**

**4   AGC 566—1994**

**AIA DOCUMENT A131/CMc AND AGC DOCUMENT 566** • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1994 EDITION
©1994 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292 • AGC
©1994 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C. 20006 •
WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

**2.2.5** The Construction Manager shall meet with the Owner and Architect to review the Control Estimate. In the event that the Owner or Architect discover any inconsistencies or inaccuracies in the information presented, they shall promptly notify the Construction Manager, who shall make appropriate adjustments to the Control Estimate. When the Control Estimate is acceptable to the Owner, the Owner shall approve it in writing.

**2.2.6** Upon the Owner's approval of the Control Estimate, the Contract Documents shall consist of (1) this Agreement, (2) AIA Document A201 and other documents referred to in this Agreement, (3) the documents enumerated in Clause 2.2.4 with the adjustments described in Clause 2.2.5, and (4) Modifications issued subsequent to the Owner's approval of the Control Estimate. If anything in the other Contract Documents is inconsistent with this Agreement, this Agreement shall govern.

**2.2.7** The Owner shall authorize and cause the Architect to revise the Drawings and Specifications to the extent necessary to reflect the agreed upon assumptions and clarifications on which the Control Estimate is based. Such revised Drawings and Specifications shall be furnished to the Construction Manager in accordance with schedules agreed to by the Owner, Architect and Construction Manager. The Construction Manager shall promptly notify the Architect and Owner if such revised Drawings and Specifications are inconsistent with the agreed upon assumptions and clarifications.

## 2.3   CONSTRUCTION PHASE

### 2.3.1   GENERAL

**2.3.1.1** The Construction Phase shall commence on the earlier of:

.1 the Owner's approval of the Control Estimate and issuance of a Notice to Proceed; or

.2 the Owner's first authorization to the Construction Manager to award a subcontract, or to undertake a portion of the Work with the Construction Manager's own forces, or to issue a purchase order for materials or equipment required for the Work.

**2.3.1.2** For purposes of Subparagraph 8.1.2 of AIA Document A201, the date of commencement of the Work shall mean the date of commencement of the Construction Phase.

**2.3.1.3** Prior to the Owner's approval of the Construction Manager's Control Estimate and issuance of a Notice to Proceed, the Construction Manager shall not incur any cost to be reimbursed as part of the Cost of the Work, except as the Owner may specifically authorize in writing.

### 2.3.2   ADMINISTRATION

**2.3.2.1** Those portions of the Work that the Construction Manager does not customarily perform with the Construction Manager's own personnel shall be performed under subcontracts or by other appropriate agreements with the Construction Manager. The Construction Manager shall obtain bids from Subcontractors and from suppliers of materials or equipment fabricated to a special design for the Work from the list previously reviewed and, after analyzing such bids, shall deliver such bids to the Owner and Architect. The Owner will then determine, with the advice of the Construction Manager and subject to the reasonable objection of the Architect, which bids will be accepted. The Owner may designate specific persons or entities from whom the Construction Manager shall obtain bids. The Construction Manager shall not be required

to contract with anyone to whom the Construction Manager has reasonable objection.

**2.3.2.2** Subcontracts and agreements with suppliers furnishing materials or equipment fabricated to a special design shall conform to the payment provisions of Subparagraphs 7.1.8 and 7.1.9 and shall not be awarded on the basis of cost plus a fee without the prior consent of the Owner.

**2.3.2.3** The Construction Manager shall schedule and conduct meetings at which the Owner, Architect, Construction Manager and appropriate Subcontractors can discuss the status of the Work. The Construction Manager shall prepare and promptly distribute meeting minutes.

**2.3.2.4** Promptly after the Owner's approval of the Control Estimate, the Construction Manager shall prepare a schedule in accordance with Paragraph 3.10 of AIA Document A201, including the Owner's occupancy requirements.

**2.3.2.5** The Construction Manager shall provide monthly written reports to the Owner and Architect on the progress of the entire Work. The Construction Manager shall maintain a daily log containing a record of weather, Subcontractors working on the site, number of workers, Work accomplished, problems encountered and other similar relevant data as the Owner may reasonably require. The log shall be available to the Owner and Architect.

## 2.4   PROFESSIONAL SERVICES

The Construction Manager shall not be required to provide professional services which constitute the practice of architecture or engineering, unless such services are specifically required by the Contract Documents for a portion of the Work or unless the Construction Manager has specifically agreed in writing to provide such services. In such event, the Construction Manager shall cause such services to be performed by appropriately licensed professionals.

## 2.5   UNSAFE MATERIALS

In addition to the provisions of Paragraph 10.1 in AIA Document A201, if reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a material or substance encountered but not created on the site by the Construction Manager, the Construction Manager shall, upon recognizing the condition, immediately stop work in the affected area and report the condition to the Owner and Architect in writing. The Owner, Construction Manager and Architect shall then proceed in the same manner described in Subparagraph 10.1.2 of AIA Document A201. The Owner shall be responsible for obtaining the services of a licensed laboratory to verify the presence or absence of the material or substance reported by the Construction Manager and, in the event such material or substance is found to be present, to verify that it has been rendered harmless. Unless otherwise required by the Contract Documents, the Owner shall furnish in writing to the Construction Manager and Architect the names and qualifications of persons or entities who are to perform tests verifying the presence or absence of such material or substance or who are to perform the task of removal or safe containment of such material or substance. The Construction Manager and Architect will promptly reply to the Owner in writing stating whether or not either has reasonable objection to the persons or entities proposed by the Owner. If either the Construction Manager or Architect has an objection to a person or entity proposed by the Owner, the Owner shall propose another to whom the Construction Manager and the Architect have no reasonable objection.

Page 19 of 39 Received on 12/6/2006 2:17:10 PM [US Mountain Standard Time]

## ARTICLE 3
## OWNER'S RESPONSIBILITIES

### 3.1    INFORMATION AND SERVICES

**3.1.1** The Owner shall provide full information in a timely manner regarding the requirements of the Project, including a program which sets forth the Owner's objectives, constraints and criteria, including space requirements and relationships, flexibility and expandability requirements, special equipment and systems, and site requirements.

**3.1.2** The Owner, upon written request from the Construction Manager, shall furnish evidence of Project financing prior to the start of the Construction Phase and from time to time thereafter as the Construction Manager may request. Furnishing of such evidence shall be a condition precedent to commencement or continuation of the Work.

**3.1.3** The Owner shall establish and update an overall budget for the Project, based on consultation with the Construction Manager and Architect, which shall include contingencies for changes in the Work and other costs which are the responsibility of the Owner.

### 3.1.4    STRUCTURAL AND ENVIRONMENTAL TESTS, SURVEYS AND REPORTS

In the Preconstruction Phase, the Owner shall furnish the following with reasonable promptness and at the Owner's expense:

**3.1.4.1** Reports, surveys, drawings and tests concerning the conditions of the site which are required by law.

**3.1.4.2** Surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, and a written legal description of the site. The surveys and legal information shall include: as applicable, grades and lines of streets, alleys, pavements and adjoining property and structures; adjacent drainage; rights-of-way, restrictions, easements, encroachments, zoning, deed restrictions, boundaries and contours of the site; locations, dimensions and necessary data pertaining to existing buildings, other improvements and trees; and information concerning available utility services and lines, both public and private, above and below grade, including inverts and depths. All information on the survey shall be referenced to a project benchmark.

**3.1.4.3** The services of a geotechnical engineer when such services are requested by the Construction Manager. Such services may include but are not limited to test borings, test pits, determinations of soil bearing values, percolation tests, evaluations of hazardous materials, ground corrosion and resistivity tests, including necessary operations for anticipating

subsoil conditions, with reports and appropriate professional recommendations.

**3.1.4.4** Structural, mechanical, chemical, air and water pollution tests, tests for hazardous materials, and other laboratory and environmental tests, inspections and reports which are required by law.

**3.1.4.5** The services of other consultants when such services are reasonably required by the scope of the Project and are requested by the Construction Manager.

The Construction Manager shall be entitled to rely upon the accuracy of any such information, reports, surveys, drawings and tests described in Clauses 3.1.4.1 through 3.1.4.5, except to the extent that the Construction Manager knows of any inaccuracy.

### 3.2    OWNER'S DESIGNATED REPRESENTATIVE

The Owner shall designate in writing a representative who shall have express authority to bind the Owner with respect to all matters requiring the Owner's approval or authorization. This representative shall have the authority to make decisions on behalf of the Owner concerning estimates and schedules, construction budgets, and changes in the Work, and shall render such decisions promptly and furnish information expeditiously, so as to avoid unreasonable delay in the services or Work of the Construction Manager.

### 3.3    ARCHITECT

The Owner shall retain an Architect to provide Basic Services, including normal structural, mechanical and electrical engineering services, other than cost estimating services, described in the edition of AIA Document B141 current as of the date of this Agreement. The Owner shall authorize and cause the Architect to provide those Additional Services described in AIA Document B141 requested by the Construction Manager which must necessarily be provided by the Architect for the Preconstruction and Construction Phases of the Work. Such services shall be provided in accordance with time schedules agreed to by the Owner, Architect and Construction Manager. Upon request of the Construction Manager, the Owner shall furnish to the Construction Manager a copy of the Owner's Agreement with the Architect, from which compensation provisions may be deleted.

### 3.4    LEGAL REQUIREMENTS

The Owner shall determine and advise the Architect and Construction Manager of any special legal requirements relating specifically to the Project which differ from those generally applicable to construction in the jurisdiction of the Project. The Owner shall furnish such legal services as are necessary to provide the information and services required under Paragraph 3.1.

AIA DOCUMENT A131/CMc AND AGC DOCUMENT 566 • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1994 EDITION
©1994 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292 • AGC
©1994 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C. 20006 •
WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

## ARTICLE 4

### COMPENSATION AND PAYMENTS FOR PRECONSTRUCTION PHASE SERVICES

The Owner shall compensate and make payments to the Construction Manager for Preconstruction Phase services as follows:

**4.1    COMPENSATION**

**4.1.1** For the services described in Paragraphs 2.1 and 2.2, the Construction Manager's compensation shall be calculated as follows:

*(State basis of compensation, whether a stipulated sum, multiple of Direct Personnel Expense, actual cost, etc. Include a statement of reimbursable cost items as applicable.)*

**4.1.2** Compensation for Preconstruction Phase Services shall be equitably adjusted if such services extend beyond                                                  from the date of this Agreement or if the originally contemplated scope of services is significantly modified.

**4.1.3** If compensation is based on a multiple of Direct Personnel Expense, Direct Personnel Expense is defined as the direct salaries of the Construction Manager's personnel engaged in the Project and the portion of the cost of their mandatory and customary contributions and benefits related thereto, such as employment taxes and other statutory employee benefits, insurance, sick leave, holidays, vacations, pensions and similar contributions and benefits.

**4.2    PAYMENTS**

**4.2.1** Payments shall be made monthly following presentation of the Construction Manager's invoice and, where applicable, shall be in proportion to services performed.

**4.2.2** Payments are due and payable                                          (                    ) days from the date the Construction Manager's invoice is received by the Owner. Amounts unpaid after the date on which payment is due shall bear interest at the rate entered below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.

*(Insert rate of interest agreed upon.)*

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Contractor's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

## ARTICLE 5

### COMPENSATION FOR CONSTRUCTION PHASE SERVICES

The Owner shall compensate the Construction Manager for Construction Phase services as follows:

**5.1    COMPENSATION**

**5.1.1** For the Construction Manager's performance of the Work as described in Paragraph 2.3, the Owner shall pay the Construction Manager in current funds the Contract Sum consisting of the Cost of the Work as defined in Article 6 and the Construction Manager's Fee determined as follows:

*(State a lump sum, percentage of actual Cost of the Work or other provision for determining the Construction Manager's Fee, and explain how the Construction Manager's Fee is to be adjusted for changes in the Work or other reasons.)*

```
Fee: Fifteen Percent (15%) of all billable costs
         See Exhibit "I"
```

AIA DOCUMENT A131/CMc AND AGC DOCUMENT 566 • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1994 EDITION
©1994 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292 • AGC
©1994 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C. 20006 •
WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

**A131/CMc**
**AGC 566—1994    7**

Page 21 of 39 Received on 12/6/2006 2:17:10 PM [US Mountain Standard Time]

## 5.2    CHANGES IN THE WORK

**5.2.1**  The Owner may, without invalidating the Contract, order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions. The Architect may make minor changes in the Work as provided in Paragraph 7.4 of AIA Document A201.

**5.2.2**  Increased costs for the items set forth in Article 6 which result from changes in the Work shall become part of the Cost of the Work, and the Construction Manager's Fee shall be adjusted if provided in Paragraph 5.1.

**5.2.3**  If the Construction Manager receives any drawings, specifications, interpretations or instructions from the Owner or Architect which are inconsistent with the Contract Documents, or encounters unanticipated conditions, any of which will result in a significant change in the cost, scope or estimated date of Substantial Completion in comparison with the Control Estimate, the Construction Manager shall promptly notify the Owner and Architect in writing and shall not proceed with the affected Work until further written instructions are received from the Owner and Architect.

**5.2.4**  If no specific provision is made in Subparagraph 5.1.1 for adjustment of the Construction Manager's Fee in the case of changes in the Work, or if the extent of such changes is such that, in the aggregate, application of the adjustment provisions of Subparagraph 5.1.1 will cause substantial inequity to the Owner or Construction Manager, the Construction Manager's Fee shall be equitably adjusted on the basis of the Fee established for the original Work.

## ARTICLE 6
### COST OF THE WORK FOR CONSTRUCTION PHASE

## 6.1    COSTS TO BE REIMBURSED

**6.1.1**  The term "Cost of the Work" shall mean costs necessarily incurred by the Construction Manager in the proper performance of the Work. Such costs shall be at rates not higher than those customarily paid at the place of the Project except with prior consent of the Owner. The Cost of the Work shall include only the items set forth in this Article 6.

## 6.1.2    LABOR COSTS

.1  Wages of construction workers directly employed by the Construction Manager to perform the construction of the Work at the site or, with the Owner's agreement, at off-site workshops.

.2  Wages or salaries of the Construction Manager's supervisory and administrative personnel when stationed at the site with the Owner's agreement.

*(If it is intended that the wages or salaries of certain personnel stationed at the Construction Manager's principal office or offices other than the site office shall be included in the Cost of the Work, such personnel shall be identified below.)*

```
Project Manager
See Exhibit "C"
```

.3  Wages and salaries of the Construction Manager's supervisory or administrative personnel engaged, at factories, workshops or on the road, in expediting the production or transportation of materials or equipment required for the Work, but only for that portion of their time required for the Work.

.4  Costs paid or incurred by the Construction Manager for taxes, insurance, contributions, assessments and benefits required by law or collective bargaining agreements, and, for personnel not covered by such agreements, customary benefits such as sick leave, medical and health benefits, holidays, vacations and pensions, provided that such costs are based on wages and salaries included in the Cost of the Work under Clauses 6.1.2.1 through 6.1.2.3.

## 6.1.3    SUBCONTRACT COSTS

Payments made by the Construction Manager to Subcontractors in accordance with the requirements of the subcontracts.

## 6.1.4    COSTS OF MATERIALS AND EQUIPMENT INCORPORATED IN THE COMPLETED CONSTRUCTION

.1  Costs, including transportation, of materials and equipment incorporated or to be incorporated in the completed construction.

.2  Costs of materials described in the preceding Clause 6.1.4.1 in excess of those actually installed but required to provide reasonable allowance for waste and for spoilage. Unused excess materials, if any, shall be handed over to the Owner at the completion of the Work or, at the Owner's option, shall be sold by the Construction Manager; amounts realized, if any, from such sales shall be credited to the Owner as a deduction from the Cost of the Work.

AIA DOCUMENT A131/CMc AND AGC DOCUMENT 566 • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1994 EDITION
©1994 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292 • AGC
©1994 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C. 20006 •
WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

**A131/CMc**
**AGC 566—1994    8**

6.1.5   **COSTS OF OTHER MATERIALS AND EQUIPMENT, TEMPORARY FACILITIES AND RELATED ITEMS**

.1   Costs, including transportation, installation, maintenance, dismantling and removal of materials, supplies, temporary facilities, machinery, equipment, and hand tools not customarily owned by the construction workers, which are provided by the Construction Manager at the site and fully consumed in the performance of the Work; and cost less salvage value on such items if not fully consumed, whether sold to others or retained by the Construction Manager. Cost for items previously used by the Construction Manager shall mean fair market value.

.2   Rental charges for temporary facilities, machinery, equipment, and hand tools not customarily owned by the construction workers, which are provided by the Construction Manager at the site, whether rented from the Construction Manager or others, and costs of transportation, installation, minor repairs and replacements, dismantling and removal thereof. Rates and quantities of equipment rented shall be subject to the Owner's prior approval.

.3   Costs of removal of debris from the site.

.4   Reproduction costs, costs of telegrams, facsimile transmissions and long-distance telephone calls, postage and express delivery charges, telephone at the site and reasonable petty cash expenses of the site office.

.5   That portion of the reasonable travel and subsistence expenses of the Construction Manager's personnel incurred while traveling in discharge of duties connected with the Work.

6.1.6   **MISCELLANEOUS COSTS**

.1   That portion directly attributable to this Contract of premiums for insurance and bonds.

   *(If charges for self insurance are to be included, specify the basis of reimbursement.)*


   2% Surcharge for increases in General Liability Insurance




.2   Sales, use or similar taxes imposed by a governmental authority which are related to the Work and for which the Construction Manager is liable.

.3   Fees and assessments for the building permit and for other permits, licenses and inspections for which the Construction Manager is required by the Contract Documents to pay.

.4   Fees of testing laboratories for tests required by the Contract Documents, except those related to nonconforming Work other than that for which payment is permitted by Clause 6.1.8.2.

.5   Royalties and license fees paid for the use of a particular design, process or product required by the Contract Documents; the cost of defending suits or claims for infringement of patent or other intellectual property rights arising from such requirement by the Contract Documents; payments made in accordance with legal judgments against the Construction Manager resulting from such suits or claims and payments of settlements made with the Owner's consent; provided, however, that such costs of legal defenses, judgment and settlements shall not be included in the calculation of the Construction Manager's Fee and provided that such royalties, fees and costs are not excluded by the last sentence of Subparagraph 3.17.1 of AIA Document A201 or other provisions of the Contract Documents.

.6   Data processing costs related to the Work.

.7   Deposits lost for causes other than the Construction Manager's negligence or failure to fulfill a specific responsibility to the Owner set forth in this Agreement.

.8   With the Owner's prior written permission, legal, mediation and arbitration costs, other than those arising from disputes between the Owner and Construction Manager, reasonably incurred by the Construction Manager in the performance of the Work.

.9   Expenses incurred in accordance with the Construction Manager's standard personnel policy for relocation and temporary living allowances of personnel required for the Work, in case it is necessary to relocate such personnel from distant locations.

6.1.7   **OTHER COSTS**

.1   Other costs incurred in the performance of the Work if and to the extent approved in advance in writing by the Owner.

6.1.8   **EMERGENCIES AND REPAIRS TO DAMAGED OR NONCONFORMING WORK**

The Cost of the Work shall also include costs described in Subparagraph 6.1.1 which are incurred by the Construction Manager:

.1   In taking action to prevent threatened damage, injury or loss in case of an emergency affecting the safety of persons and property, as provided in Paragraph 10.3 of AIA Document A201.

.2   In repairing or correcting damaged or nonconforming Work executed by the Construction Manager or the Construction Manager's Subcontractors or suppliers, provided that such damaged or nonconforming Work was not caused by the negligence or failure to fulfill a specific responsibility to the Owner set forth in this Agreement of the Construction Manager or the Construction Manager's foremen, engineers or superintendents, or other supervisory, administrative or managerial personnel of the Construction Manager, or the failure of the Construction Manager's personnel to supervise adequately the Work of the Subcontractors or suppliers, and only to the extent that the cost of repair or correction is not recoverable by the Construction Manager from insurance, Subcontractors or suppliers.

AIA DOCUMENT A131/CMc AND AGC DOCUMENT 566 • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1991 EDITION
©1994 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292 • AGC
©1994 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C. 20006 •
WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

Page 23 of 39 Received on 12/6/2006 2:17:10 PM [US Mountain Standard Time]

**6.1.9** The costs described in Subparagraphs 6.1.1 through 6.1.8 shall be included in the Cost of the Work, notwithstanding any provision of AIA Document A201 or other Conditions of the Contract which may require the Construction Manager to pay such costs, unless such costs are excluded by the provisions of Paragraph 6.2.

**6.2**    **COSTS NOT TO BE REIMBURSED**

**6.2.1**  The Cost of the Work shall not include:

.1  Salaries and other compensation of the Construction Manager's personnel stationed at the Construction Manager's principal office or offices other than the site office, except as specifically provided in Clauses 6.1.2.1 through 6.1.2.3.

.2  Expenses of the Construction Manager's principal office and offices other than the site office except as specifically provided in Paragraph 6.1.

.3  Overhead and general expenses, except as may be expressly included in Paragraph 6.1.

.4  The Construction Manager's capital expenses, including interest on the Construction Manager's capital employed for the Work.

.5  Rental costs of machinery and equipment, except as specifically provided in Subparagraph 6.1.5.2.

.6  Except as provided in Clause 6.1.8.2, costs due to the negligence of the Construction Manager or to the failure of the Construction Manager to fulfill a specific responsibility to the Owner set forth in this Agreement.

.7  Costs incurred in the performance of Preconstruction Phase Services.

.8  Except as provided in Clause 6.1.7.1, any cost not specifically and expressly described in Paragraph 6.1.

**6.3**    **DISCOUNTS, REBATES AND REFUNDS**

**6.3.1**  Cash discounts obtained on payments made by the Construction Manager shall accrue to the Owner if (1) before making the payment, the Construction Manager included them in an Application for Payment and received payment therefor from the Owner, or (2) the Owner has deposited funds with the Construction Manager with which to make payments; otherwise, cash discounts shall accrue to the Construction Manager. Trade discounts, rebates, refunds and amounts received from sales of surplus materials and equipment shall accrue to the Owner, and the Construction Manager shall make provisions so that they can be secured.

**6.3.2**  Amounts which accrue to the Owner in accordance with the provisions of Subparagraph 6.3.1 shall be credited to the Owner as a deduction from the Cost of the Work.

**6.4**    **ACCOUNTING RECORDS**

**6.4.1**  The Construction Manager shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management under this Contract; the accounting and control systems shall be satisfactory to the Owner. The Owner and the Owner's accountants shall be afforded access to the Construction Manager's records, books, correspondence, instructions, drawings, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to this Project, and the Construction Manager shall preserve these for a period of three years after final payment, or for such longer period as may be required by law.

## ARTICLE 7
## CONSTRUCTION PHASE PAYMENTS

**7.1**    **PROGRESS PAYMENTS**

**7.1.1**  Based upon Applications for Payment submitted to the Architect by the Construction Manager and Certificates for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum to the Construction Manager as provided below and elsewhere in the Contract Documents.

**7.1.2**  The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

Twice Monthly

**7.1.3**  Provided an Application for Payment is received by the Architect not later than the
of a month, the Owner shall make payment to the Construction Manager not later than the        N/A                        day
of the                    month. If an Application for Payment is received by the Architect after the application date fixed above,    day
payment shall be made by the Owner not later than                            days after the Architect receives the
Application for Payment.

**7.1.4**  With each Application for Payment, the Construction Manager shall submit payrolls, petty cash accounts, receipted invoices or invoices with check vouchers attached, and any other evidence required by the Owner or Architect to demonstrate that cash

AIA DOCUMENT A131/CMc AND AGC DOCUMENT 565 • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1994 EDITION
©1991 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292 • AGC
©1994 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C. 20006 •
WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

**A131/CMc**
**AGC 566—1994    10**

Page 24 of 39 Received on 12/6/2006 2:17:10 PM [US Mountain Standard Time]

7.1.10  In taking action on the Construction Manager's Applications for Payment, the Architect shall be entitled to rely on the accuracy and completeness of the information furnished by the Construction Manager and shall not be deemed to represent that the Architect has made a detailed examination, audit or arithmetic verification of the documentation submitted in accordance with Subparagraph 7.1.4 or other supporting data; that the Architect has made exhaustive or continuous on-site inspections, or that the Architect has made examinations to ascertain how or for what purposes the Construction Manager has used amounts previously paid on account of the Contract. Such examinations, audits and verifications, if required by the Owner, will be performed by the Owner's accountants acting in the sole interest of the Owner.

## 7.2    FINAL PAYMENT

7.2.1  Final payment shall be made by the Owner to the Construction Manager when (1) the Contract has been fully performed by the Construction Manager, except for the Construction Manager's responsibility to correct nonconforming Work, as provided in Subparagraph 12.2.2 of AIA Document A201, and to satisfy other requirements, if any, which necessarily survive final payment; (2) a final Application for Payment and a final accounting for the Cost of the Work have been submitted by the Construction Manager and reviewed by the Owner's accountants; and (3) a final Certificate for Payment has then been issued by the Architect; such final payment shall be made by the Owner not more than 30 days after the issuance of the Architect's final Certificate for Payment, or as follows:

7.2.2  The amount of the final payment shall be calculated as follows:

.1  Take the sum of the Cost of the Work substantiated by the Construction Manager's final accounting and the Construction Manager's Fee.

.2  Subtract amounts, if any, for which the Architect withholds, in whole or in part, a final Certificate for Payment as provided in Subparagraph 9.5.1 of AIA Document A201 or other provisions of the Contract Documents.

.3  Subtract the aggregate of previous payments made by the Owner.

If the aggregate of previous payments made by the Owner exceeds the amount due the Construction Manager, the Construction Manager shall reimburse the difference to the Owner.

7.2.3  The Owner's accountants will review and report in writing on the Construction Manager's final accounting within 30 days after delivery of the final accounting to the Architect by the Construction Manager. Based upon such Cost of the Work as the Owner's accountants report to be substantiated by the Construction Manager's final accounting, and provided the other conditions of Subparagraph 7.2.1 have been met, the Architect will, within seven days after receipt of the written report of the Owner's accountants, either issue to the Owner a final Certificate for Payment with a copy to the Construction Manager, or notify the Construction Manager and Owner in writing of the Architect's reasons for withholding a certificate as provided in Subparagraph 9.5.1 of AIA Document A201. The time periods stated in this Paragraph 7.2 supersede those stated in Subparagraph 9.4.1 of AIA Document A201.

7.2.4  If the Owner's accountants report the Cost of the Work as substantiated by the Construction Manager's final accounting to be less than claimed by the Construction Manager, the Construction Manager shall be entitled to proceed in accordance with Article 9 without a further decision of the Architect. Unless agreed to otherwise, a demand for mediation or arbitration of the disputed amount shall be made by the Construction Manager within 60 days after the Construction Manager's receipt of a copy of the Architect's final Certificate for Payment. Failure to make such demand within this 60-day period shall result in the substantiated amount reported by the Owner's accountants becoming binding on the Construction Manager. Pending a final resolution of the disputed amount, the Owner shall pay the Construction Manager the amount certified in the Architect's final Certificate for Payment.

7.2.5  If, subsequent to final payment and at the Owner's request, the Construction Manager incurs costs described in Paragraph 6.1 and not excluded by Paragraph 6.2 (1) to correct nonconforming Work, or (2) arising from the resolution of disputes, the Owner shall reimburse the Construction Manager such costs and the Construction Manager's Fee, if any, related thereto on the same basis as if such costs had been incurred prior to final payment.

## ARTICLE 8
## INSURANCE AND BONDS

### 8.1    INSURANCE REQUIRED OF THE CONSTRUCTION MANAGER

During both phases of the Project, the Construction Manager shall purchase and maintain insurance as set forth in Paragraph 11.1 of AIA Document A201. Such insurance shall be written for not less than the following limits, or greater if required by law:

8.1.1  Workers' Compensation and Employers' Liability meeting statutory limits mandated by State and Federal laws. If (1) limits in excess of those required by statute are to be provided, or (2) the employer is not statutorily bound to obtain such insurance coverage, or (3) additional coverages are required, additional coverages and limits for such insurance shall be as follows:

AIA DOCUMENT A131/CMc AND AGC DOCUMENT 566 • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1994 EDITION
©1994 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292 • AGC
©1994 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C. 20006 •
WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

Page 25 of 39 Received on 12/6/2006 2:17:10 PM [US Mountain Standard Time]

**7.1.10** In taking action on the Construction Manager's Applications for Payment, the Architect shall be entitled to rely on the accuracy and completeness of the information furnished by the Construction Manager and shall not be deemed to represent that the Architect has made a detailed examination, audit or arithmetic verification of the documentation submitted in accordance with Subparagraph 7.1.4 or other supporting data; that the Architect has made exhaustive or continuous on-site inspections, or that the Architect has made examinations to ascertain how or for what purposes the Construction Manager has used amounts previously paid on account of the Contract. Such examinations, audits and verifications, if required by the Owner, will be performed by the Owner's accountants acting in the sole interest of the Owner.

**7.2   FINAL PAYMENT**

**7.2.1** Final payment shall be made by the Owner to the Construction Manager when (1) the Contract has been fully performed by the Construction Manager, except for the Construction Manager's responsibility to correct nonconforming Work, as provided in Subparagraph 12.2.2 of AIA Document A201, and to satisfy other requirements, if any, which necessarily survive final payment; (2) a final Application for Payment and a final accounting for the Cost of the Work have been submitted by the Construction Manager and reviewed by the Owner's accountants; and (3) a final Certificate for Payment has then been issued by the Architect; such final payment shall be made by the Owner not more than 30 days after the issuance of the Architect's final Certificate for Payment, or as follows:

**7.2.2** The amount of the final payment shall be calculated as follows:

　.1   Take the sum of the Cost of the Work substantiated by the Construction Manager's final accounting and the Construction Manager's Fee.

　.2   Subtract amounts, if any, for which the Architect withholds, in whole or in part, a final Certificate for Payment as provided in Subparagraph 9.5.1 of AIA Document A201 or other provisions of the Contract Documents.

　.3   Subtract the aggregate of previous payments made by the Owner.

If the aggregate of previous payments made by the Owner exceeds the amount due the Construction Manager, the Construction Manager shall reimburse the difference to the Owner.

**7.2.3** The Owner's accountants will review and report in writing on the Construction Manager's final accounting within 30 days after delivery of the final accounting to the Architect by the Construction Manager. Based upon such Cost of the Work as the Owner's accountants report to be substantiated by the Construction Manager's final accounting, and provided the other conditions of Subparagraph 7.2.1 have been met, the Architect will, within seven days after receipt of the written report of the Owner's accountants, either issue to the Owner a final Certificate for Payment with a copy to the Construction Manager, or notify the Construction Manager and Owner in writing of the Architect's reasons for withholding a certificate as provided in Subparagraph 9.5.1 of AIA Document A201. The time periods stated in this Paragraph 7.2 supersede those stated in Subparagraph 9.4.1 of AIA Document A201.

**7.2.4** If the Owner's accountants report the Cost of the Work as substantiated by the Construction Manager's final accounting to be less than claimed by the Construction Manager, the Construction Manager shall be entitled to proceed in accordance with Article 9 without a further decision of the Architect. Unless agreed to otherwise, a demand for mediation or arbitration of the disputed amount shall be made by the Construction Manager within 60 days after the Construction Manager's receipt of a copy of the Architect's final Certificate for Payment. Failure to make such demand within this 60-day period shall result in the substantiated amount reported by the Owner's accountants becoming binding on the Construction Manager. Pending a final resolution of the disputed amount, the Owner shall pay the Construction Manager the amount certified in the Architect's final Certificate for Payment.

**7.2.5** If, subsequent to final payment and at the Owner's request, the Construction Manager incurs costs described in Paragraph 6.1 and not excluded by Paragraph 6.2 (1) to correct nonconforming Work, or (2) arising from the resolution of disputes, the Owner shall reimburse the Construction Manager such costs and the Construction Manager's Fee, if any, related thereto on the same basis as if such costs had been incurred prior to final payment.

**ARTICLE 8**

**INSURANCE AND BONDS**

**8.1   INSURANCE REQUIRED OF THE CONSTRUCTION MANAGER**

During both phases of the Project, the Construction Manager shall purchase and maintain insurance as set forth in Paragraph 11.1 of AIA Document A201. Such insurance shall be written for not less than the following limits, or greater if required by law:

**8.1.1** Workers' Compensation and Employers' Liability meeting statutory limits mandated by State and Federal laws. If (1) limits in excess of those required by statute are to be provided, or (2) the employer is not statutorily bound to obtain such insurance coverage, or (3) additional coverages are required, additional coverages and limits for such insurance shall be as follows:

AIA DOCUMENT A131/CMc AND AGC DOCUMENT 566 • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1994 EDITION
©1994 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292 • AGC
©1994 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C. 20006 •
WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

A131/CMc
AGC 566—1994   12

Page 26 of 39 Received on 12/6/2006 2:17:10 PM [US Mountain Standard Time]

8.1.2. Commercial General Liability, including coverage for Premises-Operations, Independent Contractors' Protective, Products-Completed Operations, Contractual Liability, Personal Injury, and Broad Form Property Damage (including coverage for Explosion, Collapse and Underground hazards):

| | | |
|---|---|---|
| $ 500,000 | | Each Occurrence |
| $ 1,000,000 | | General Aggregate |
| $ 500,000 | | Personal and Advertising Injury |
| $ 1,000,000 | | Products-Completed Operations Aggregate |

.1 The policy shall be endorsed to have the General Aggregate apply to this Project only.

.2 Products and Completed Operations insurance shall be maintained for a minimum period of at least (        ) year(s) after either 90 days following Substantial Completion or final payment, whichever is earlier.

.3 The Contractual Liability insurance shall include coverage sufficient to meet the obligations in AIA Document A201 under Paragraph 3.18.

8.1.3 Automobile Liability (owned, non-owned and hired vehicles) for bodily injury and property damage:

$500,000    Each Accident

8.1.4 Other coverage:

*(If Umbrella Excess Liability coverage is required over the primary insurance or retention, insert the coverage limits. Commercial General Liability and Automobile Liability limits may be attained by individual policies or by a combination of primary policies and Umbrella and/or Excess Liability policies.)*

$5,000,000  Umbrella

## 8.2    INSURANCE REQUIRED OF THE OWNER

During both phases of the Project, the Owner shall purchase and maintain liability and property insurance, including waivers of subrogation, as set forth in Paragraphs 11.2 and 11.3 of AIA Document A201. Such insurance shall be written for not less than the following limits, or greater if required by law:

| | | |
|---|---|---|
| 8.2.1 Property Insurance: Builder's Risk | $ 1,000 | Deductible Per Occurrence |
| General Liability, $1 million coverage | $ 1,000 | Aggregate Deductible |

8.2.2 Boiler and Machinery insurance with a limit of:    $

*(If not a blanket policy, list the objects to be insured.)*

## B.3    PERFORMANCE BOND AND PAYMENT BOND

B.3.1 The Construction Manager  shall not  *(Insert "shall" or "shall not")* furnish bonds covering faithful performance of the Contract and payment of obligations arising thereunder. Bonds may be obtained through the Construction Manager's usual source and the cost thereof shall be included in the Cost of the Work. The amount of each bond shall be equal to _____ percent (    %) of the Contract Sum.

B.3.2 The Construction Manager shall deliver the required bonds to the Owner at least three days before the commencement of any Work at the Project site.

AIA DOCUMENT A131/CMc AND AGC DOCUMENT 566 • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1994 EDITION
©1994 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292 • AGC
©1994 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C. 20006 •
WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

A131/CMc
AGC 566—1994    13

## ARTICLE 9
## MISCELLANEOUS PROVISIONS

### 9.1    DISPUTE RESOLUTION FOR THE PRECONSTRUCTION PHASE

9.1.1  Claims, disputes or other matters in question between the parties to this Agreement which arise prior to the commencement of the Construction Phase or which relate solely to the Preconstruction Phase services of the Construction Manager or to the Owner's obligations to the Construction Manager during the Preconstruction Phase, shall be resolved by mediation or by arbitration. Prior to arbitration, the parties shall endeavor to reach settlement by mediation.

9.1.2  Any mediation conducted pursuant to this Paragraph 9.1 shall be held in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect, unless the parties mutually agree otherwise. Demand for mediation shall be filed in writing with the other party to this Agreement and with the American Arbitration Association. Any demand for mediation shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for mediation be made after the date when institution of legal or equitable proceedings based upon such claim, dispute or other matter in question would be barred by the applicable statute of limitations.

9.1.3  Any claim, dispute or other matter in question not resolved by mediation shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect, unless the parties mutually agree otherwise.

9.1.4  Demand for arbitration shall be filed in writing with the other party to this Agreement and with the American Arbitration Association. A demand for arbitration may be made concurrent with a demand for mediation and shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based upon such claim, dispute or other matter in question would be barred by the applicable statute of limitations.

9.1.5  No arbitration arising out of or relating to this Agreement shall include, by consolidation or joinder or in any other manner, the Architect, the Architect's employees or consultants, except by written consent containing specific reference to this Agreement and signed by the Architect, Owner, Construction Manager and any other person or entity sought to be joined. No arbitration shall include, by consolidation or joinder or in any other manner, parties other than the Owner, Construction Manager, a separate contractor as described in Article 6 of AIA Document A201 and other persons substantially involved in a common question of fact or law whose presence is required if complete relief is to be accorded in arbitration. No person or entity other than the Owner or Construction Manager or a separate contractor as described in Article 6 of AIA Document A201 shall be included as an original third party or additional third party to an arbitration whose interest or responsibility is insubstantial. Consent to arbitration involving an additional person or entity shall not constitute agreement to arbitration of a dispute not described in such consent or with a person or entity not named or described therein. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by parties to this Agreement shall be specifically enforceable under applicable law in any court having jurisdiction thereof.

9.1.6  The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

### 9.2    DISPUTE RESOLUTION FOR THE CONSTRUCTION PHASE

9.2.1  Any other claim, dispute or other matter in question arising out of or related to this Agreement or breach thereof shall be settled in accordance with Article 4 of AIA Document A201, except that in addition to and prior to arbitration, the parties shall endeavor to reach settlement by mediation in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect, unless the parties mutually agree otherwise. Any mediation arising under this Paragraph shall be conducted in accordance with the provisions of Subparagraphs 9.1.2 and 9.1.3.

### 9.3    OTHER PROVISIONS

9.3.1  Unless otherwise noted, the terms used in this Agreement shall have the same meaning as those in the 1987 edition of AIA Document A201, General Conditions of the Contract for Construction.

### 9.3.2    EXTENT OF CONTRACT

This Contract, which includes this Agreement and the other documents incorporated herein by reference, represents the entire and integrated agreement between the Owner and the Construction Manager and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both the Owner and Construction Manager. If anything in any document incorporated into this Agreement is inconsistent with this Agreement, this Agreement shall govern.

### 9.3.3    OWNERSHIP AND USE OF DOCUMENTS

The Drawings, Specifications and other documents prepared by the Architect, and copies thereof furnished to the Construction Manager, are for use solely with respect to this Project. They are not to be used by the Construction Manager, Subcontractors, Sub-subcontractors or suppliers on other projects, or for additions to this Project outside the scope of the Work, without the specific written consent of the Owner and Architect. The Construction Manager, Subcontractors, Sub-subcontractors and suppliers are granted a limited license to use and reproduce applicable portions of the Drawings, Specifications and other documents prepared by the Architect appropriate to and for use in the execution of their Work under the Contract Documents.

### 9.3.4    GOVERNING LAW

The Contract shall be governed by the law of the place where the Project is located.

### 9.3.5    ASSIGNMENT

The Owner and Construction Manager respectively bind themselves, their partners, successors, assigns and legal representatives to the other party hereto and to partners, successors, assigns and legal representatives of such other party in respect to covenants, agreements and obligations contained in the Contract Documents. Neither party to the Contract shall assign the Contract as a whole without written consent of the other. If either party attempts to make such an assignment without such consent, that party shall nevertheless remain legally responsible for all obligations under the Contract.

AIA DOCUMENT A131/CMc AND AGC DOCUMENT 566 • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1994 EDITION
©1994 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292 • AGC
©1994 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C. 20006 •
WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

Page 28 of 39 Received on 12/6/2006 2:17:10 PM [US Mountain Standard Time]

## ARTICLE 10
### TERMINATION OR SUSPENSION

**10.1    TERMINATION PRIOR TO THE OWNER'S APPROVAL OF THE CONTROL ESTIMATE**

**10.1.1**  Prior to the Owner's approval of the Control Estimate, the Owner may terminate this Contract at any time without cause, and the Construction Manager may terminate this Contract for any of the reasons described in Subparagraph 14.1.1 of AIA Document A201. The provisions of Article 14 of AIA Document A201 do not otherwise apply to this Paragraph 10.1.

**10.1.2**  If the Owner or Construction Manager terminates this Contract pursuant to this Paragraph 10.1 prior to commencement of the Construction Phase, the Construction Manager shall be equitably compensated for Preconstruction Phase Services performed prior to receipt of notice of termination; provided, however, that the compensation for such services shall not exceed the compensation set forth in Subparagraph 4.1.1.

**10.1.3**  If the Owner or Construction Manager terminates this Contract pursuant to this Paragraph 10.1 after commencement of the Construction Phase, and prior to the Owner's approval of the Control Estimate, the Construction Manager shall, in addition to the compensation provided in Subparagraph 10.1.2, be paid an amount calculated as follows:

.1  Take the Cost of the Work incurred by the Construction Manager.

.2  Add the Construction Manager's Fee computed upon the Cost of the Work to the date of termination at the rate stated in Paragraph 5.1 or, if the Construction Manager's Fee is stated as a fixed sum in that Paragraph, an amount which bears the same ratio to that fixed-sum Fee as the Cost of the Work at the time of termination bears to a reasonable estimate of the probable Cost of the Work upon its completion.

.3  Subtract the aggregate of previous payments made by the Owner on account of the Construction Phase.

The Owner shall also pay the Construction Manager fair compensation, either by purchase or rental at the election of the Owner, for any equipment owned by the Construction Manager which the Owner elects to retain and which is not otherwise included in the Cost of the Work under Clause 10.1.3.1. To the extent that the Owner elects to take legal assignment of subcontracts and purchase orders (including rental agreements), the Construction Manager shall, as a condition of receiving the payments referred to in this Article 10, execute and deliver all such papers and take all such steps, including the legal assignment of such subcontracts and other contractual rights of the Construction Manager, as the Owner may require for the purpose of fully vesting in the Owner the rights and benefits of the Construction Manager under such subcontracts or purchase orders.

Subcontracts, purchase orders and rental agreements entered into by the Construction Manager with the Owner's written approval prior to the Owner's approval of the Control Estimate shall contain provisions permitting assignment to the Owner as described above. If the Owner accepts such assignment, the Owner shall reimburse or indemnify the Construction Manager with respect to all costs arising under the subcontract, purchase order or rental agreement, except those which would not have been reimbursable as Cost of the Work if the contract had not been terminated. If the Owner elects not to accept the assignment of any subcontract, purchase order or rental agreement which would have constituted a Cost of the Work had this agreement not been terminated, the Construction Manager shall terminate such subcontract, purchase order or rental agreement and the Owner shall pay the Construction Manager the costs necessarily incurred by the Construction Manager by reason of such termination.

**10.2    TERMINATION SUBSEQUENT TO THE OWNER'S APPROVAL OF THE CONTROL ESTIMATE**

**10.2.1**  Subsequent to the Owner's approval of the Control Estimate, the Contract may be terminated as provided in Subparagraphs 14.1.1 and 14.2.1 of AIA Document A201. The provisions of Article 14 of AIA Document A201 do not otherwise apply to this Paragraph 10.2.

**10.2.2**  In the event of such termination by the Owner, the amount payable to the Construction Manager shall not exceed the amount the Construction Manager would have been entitled to receive pursuant to Subparagraphs 10.1.2 and 10.1.3 of this Agreement, less any compensation that may be awarded to the Owner pursuant to Paragraph 9.2.

**10.2.3**  In the event of such termination by the Construction Manager, the amount payable to the Construction Manager shall be in accordance with Subparagraphs 10.1.2 and 10.1.3 of this Agreement, except that the Construction Manager's Fee shall be calculated as if the Work had been fully completed by the Construction Manager, including a reasonable estimate of the Cost of the Work for Work not actually completed.

**10.2.4**  In addition to the Owner's right to terminate this Agreement for cause as provided in Subparagraph 14.2.1 of AIA document A201, the Owner may terminate this Agreement without cause; in such case, the Construction Manager shall be paid as provided in Subparagraph 10.2.3.

**10.3    NOTICE OF TERMINATION**

**10.3.1**  The party seeking termination shall give the other party seven days' written notice.

**10.4    SUSPENSION**

The Work may be suspended by the Owner as provided in Article 14 of AIA Document A201; in such case, the associated increase in costs shall become part of the Cost of Work, and the Construction Manager's Fee shall be adjusted in accordance with Paragraph 5.1.

**A131/CMc**

**15    AGC 566—1994**

AIA DOCUMENT A131/CMc AND AGC DOCUMENT 566 • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1994 EDITION ©1994 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292 • AGC ©1994 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C. 20005 • WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

Page 29 of 39 Received on 12/6/2006 2:17:10 PM [US Mountain Standard Time]

## ARTICLE 11
### OTHER CONDITIONS AND SERVICES

See Exhibits:

A – Scope of Work
B – None
C – Labor Rates
D – None
E – Required Notices
F – Dispute Resolution: Mediation and Arbitration
G – Notice of Cancellation
H – None
I – Contract Fee

This Agreement entered into as of the day and year first written above.

OWNER:                              CONSTRUCTION MANAGER:

By: _____        By: _____

Date: _____        Date: _____5/8/22_____

ATTEST: _____        ATTEST: _____

**AIA** CAUTION: You should sign an original AIA document which has this caution printed in red. An original assures that changes will not be obscured as may occur when documents are reproduced. See Instruction Sheet for Limited License for Reproduction of this document.

AIA DOCUMENT A131/CMc AND AGC DOCUMENT 566 • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1994 EDITION
©1994 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292 • AGC
©1994 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C. 20006 •
WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

**A131/CMc**
**AGC 566—1994   16**

CANYON CONSTRUCTION          General Building Contractors          Lic. No. 785932
                                      Since 1966

## Scope of Work
### Exhibit "A"

| | |
|---|---|
| CONTROL BUDGET: BUTRESS WALL AND NEW POOL | 508,072.00 |
| 2% Surcharge Cost for General Liability Insurance | 10,161.00 |
| 20% Owner's Contingency for Design Changes | 103,646.00 |
| TOTAL | 621,879.00 |

Work to be performed includes removing the existing pool and all soils at retaining wall. Reinforce the retaining wall according to plans and backfill whole area with imported fill. Then install new pool and according to original plans.

All work would be completed on a cost plus a fee basis with the fee being 15% on all billable costs. We have included an Owner's design and construction contingency of 20% to provide for unknown or hidden conditions which may alter the design or the amount of work.

### SCOPE OF WORK
The Scope of Work shall be as shown on the Plans, Specifications and Soil Investigation as follows:
- Drawings: Pages 1 by Ingraham * DeJesse Associates, dated 01-Mar-02

### NOTES & CONDITIONS
The following assumptions are reflected in the amount stated above:
- Commencement of construction is projected to be June 3, 2002
- All work will be done with building permits and inspections, all special inspections and cost of permits, if needed, will be obtained and paid for by others
- Any additional remedial work beyond the Scope of Work will be brought to the attention of the Owner for a decision before work begins
- 20% Owner's contingency for design changes: As requested by the engineers, final evaluations of the existing retaining wall will occur after complete excavations and removal of the pool and back fill areas. This may lead to alternative remedial solutions and additional costs.
- Final clean up will include off-haul of all debris and hosing down driveway and street
- Contractor may use one of the house telephone lines for a job phone, local and job related calls only. Construction people may use owner's power and water
- We will have a temporary toilet on site for workers' use
- Work area will be hosed down regularly during excavation to diminish dust
- This estimate is based upon the assumption that there are 900 CY of soils to be hauled away by truck. The trucking company will determine soils count.
- Soils will be hauled to the Vasco Landfill, dump fees are assumed to be free for clean fill
- We will have a full-time Foreman on site while work is in progress
- Pier tailings will remain on site to be inspected by engineer for suitability for fill
- We will install a new drainage line using SDR-35 pipe, we expect to find the existing pipe crushed, it will be removed. We have assumed new pipe at the foot of the wall and connecting to the existing outlets.
- Pool subcontractor will install a new pool, all new plumbing and equipment
- The existing limestone paving will be removed in order to remove bad soil and upon completion of backfill we will pour a new slab and install new limestone pavers

### BUILDER'S ALLOWANCES
The following items are included as material allowances:
1. Limestone material and installation                    39,600.00
2. Pier depths are as shown on the structural plans. Actual depths are subject to field review by the Geotechnical engineer.

### NOT INCLUDED
Items not included in this contract are as follows:
- Permits, fees, bonds and taxes, special inspections
- Architectural, soil and structural engineering services, inspections & supervision
- Our estimate is based upon current OSHA requirements. Additional site protection and/or shoring, as directed by the supervising soil engineer, will be bid as required. No provision has been made for erosion control procedures or other features that may be shown on the grading plan.
- Landscaping and landscape lighting, fences and gates, exterior handrails, plant items, irrigation, gray water irrigation, etc. are not included.
- Pool fencing
- Additional work not included in the drawings will be in addition to the amount above. This includes details or comments "flagged" by the local and county building inspection department or its field representatives

Contractor _____,          Owner/Agent _____,       _____
            (initials)                              (initials)               (initials)

Page 31 of 39 Received on 12/6/2006 2:17:10 PM [US Mountain Standard Time]

| CANYON CONSTRUCTION | General Building Contractors Since 1966 | Lic. No. 785932 |

## LABOR RATES
### Exhibit "C"

| Labor | # Hours | $ per hour | Amount |
|-------|---------|-----------|--------|
| Contractor | | @ 80.00 | $_____ |
| Estimating | _____ | @ 65.00 | $_____ |
| Project Manager | _____ | @ 70.00 | $_____ |
| Superintendent | _____ | @ 70.00 | $_____ |
| Project Coordinator | _____ | @ 60.00 | $_____ |
| Foreman | _____ | @ 60.00 | $_____ |
| Carpenter | _____ | @ 55.00 | $_____ |
| Apprentice Carpenter | _____ | @ 40.00 | $_____ |
| Laborer | _____ | @ 30.00 | $_____ |
| Clerical | _____ | @ 30.00 | $_____ |
| Materials & Rentals | | @Invoiced Cost | $_____ |
| Subcontracts | | @Invoiced Cost | $_____ |
| | | Sub-Total | $_____ |
| | | 15% OHP | $_____ |
| | | Total Invoice | $_____ |

These rates include all fringe benefits and payroll burden. The above labor rates are good until December 31, 2001.

Canyon Construction:                                Owner/Agent(s):

_____ 5/8/02                            _____
President          Date                              Owner/Agent          Date


                                                    _____
                                                    Owner/Agent          Date

2001 Rates, revised 1/19/01

Page 32 of 39 Received on 12/6/2006 2:17:10 PM [US Mountain Standard Time]

| CANYON CONSTRUCTION | General Building Contractors<br>Since 1966 | Lic. No. 785932 |

# REQUIRED NOTICES
## Exhibit "E"

Contractors are required by law to be licensed and regulated by the Contractor's State License Board. Any questions concerning a contractor may be referred to the Registrar Contractor's State License Board, 3132 Bradshaw Rd., Sacramento, CA. Mailing address: P.O. Box 2600, Sacramento, California. You, as Owner or Tenant, have the right to require the Contractor to have a Performance and Payment Bond. See "Notice to Owner" below. Contractor's failure to substantially commence work, without lawful excuse, within twenty (20) days from the date specified above is a violation of the Contractor's License Law. You, the buyer, may cancel this transaction at any time prior to midnight of the third business day after the date of this transaction. See "Notice of Cancellation" attached as Exhibit "G" for an explanation of this right.

**"NOTICE TO OWNER"** (As required by §7008; 7018.5 &7159)
THE LAW REQUIRES THAT, BEFORE A LICENSED CONTRACTOR CAN ENTER INTO A CONTRACT WITH YOU FOR A WORK OF IMPROVEMENT ON YOUR PROPERTY, HE MUST GIVE YOU A COPY OF THIS NOTICE.

Under the California Mechanics' Lien Law, any contractor, subcontractor, laborer, supplier or other person who helps to improve your property, but is not paid for his or her work or supplies, has a right to place a lien on your home, land or property where the work was performed and to sue you in court to obtain payment. This means that after a court hearing, your home, land and property could be sold by a court officer and the proceeds of the sale used to satisfy what you owe. This can happen even if you have paid your contractor in full if the contractor's subcontractors, laborers or suppliers remain unpaid.

To preserve their rights to file a claim or lien against your property, certain claimants such as subcontractors or material suppliers are required to provide you with a document entitled a "Preliminary Notice." Contractors and laborers wages who contract with owners directly do not have to provide this notice since you are aware of their existence as an owner. A preliminary notice is not a lien against your property. Its purpose is to notify you of persons or entities that may have a right to file a lien against your property if they are not paid. In order to perfect their lien rights, a contractor, subcontractor, supplier or laborer must file a mechanics' lien with the county recorder which then becomes a recorded lien against your property. Generally, the maximum time allowed for filing a mechanics' lien against your property is ninety (90) days after completion of your project.

TO INSURE EXTRA PROTECTION FOR YOURSELF AND YOUR PROPERTY, YOU MAY WISH TO TAKE ONE OR MORE OF THE FOLLOWING STEPS:

1.  Require that your contractor supply you with a payment and performance bond (not a license bond), which provides that the bonding company will either complete the project or pay damages up to the amount of the bond. This payment and performance bond as well as a copy of the construction contract should be filed with the county recorder for your further protection. The payment and performance bond will usually cost from 1 to 5 percent of the contract amount depending on the contractor's bonding ability. If a contractor cannot obtain such bonding, it may indicate his or her financial incapacity.

2.  Require that payments be made directly to subcontractors and material suppliers through a joint control. Funding services may be available, for a fee, in your area which will establish voucher or other means of payment to your contractor. These services may also provide you with lien waivers and other forms of protection. Any joint control agreement should include the addendum approved by the Registrar of Contractors.

3.  Issue joint checks for payment, made out to both your contractor and subcontractors or material suppliers involved in the project. The joint checks should be made payable to the persons or entities which send preliminary notices to you. Those persons or entities have indicated that they may have lien rights on your property; therefore, you need to protect yourself. This will help to insure that all persons due payment are actually paid.

4.  Upon making payment on any completed phase of the project, and before making any further payments, require your contractor to provide you with unconditional "Waiver and Release" forms signed by each material supplier, subcontractor, and laborer involved in that portion of the work for which payment was made. The statutory lien releases are set forth in exact language in Section 3262 of the Civil Code. Most stationery stores will sell the

1

Page 33 of 39 Received on 12/6/2006 2:17:10 PM [US Mountain Standard Time]

"Waiver and Release" forms if your contractor does not have them. The material suppliers, subcontractors, and laborers that you obtain releases from are those persons or entities who have filed preliminary notices with you. If you are not certain of the material suppliers, subcontractors, and laborers working on your project, you may obtain a list from your contractor. On projects involving improvements to a single-family residence or a duplex owned by the individuals, the person signing these releases lose the right to file a mechanics' lien claim against your property. In other types of construction, this protection may still be important, but may not be as complete.

To protect yourself under this option, you must be certain that all material suppliers, subcontractors, and laborers have signed the "Waiver and Release" form. If a mechanics' lien has been filed against your property, it can only be voluntarily released by a recorded "Release of Mechanics' Lien" signed by the person or entity that filed the mechanics' lien against your property unless the lawsuit to enforce the lien was not timely filed. You should not make any final payments until any and all such liens are removed. You should consult an attorney if a lien is filed against your property.

Contractor_____/M/_____          Owner/Agent_____,  _____
         (initials)                                 (initials)           (initials)

2

| CANYON CONSTRUCTION | General Building Contractors<br>Since 1966 | Lic. No. 785932 |
|---|---|---|

## DISPUTE RESOLUTION:
## MEDIATION AND ARBITRATION
### Exhibit "F"

The parties to this Agreement establish this dispute resolution section to resolve any misunderstanding, concern, dispute or question about this Agreement and/or the related construction work, in a prompt, efficient and cost effective framework.

A. MEDIATION: In the event either party desires an independent neutral third part to act as a mediator, they may call any independent mediator or mediation organization mutually acceptable to both parties to request a non-binding confidential mediation. Each party shall pay half the cost of Mediation.

B. ARBITRATION: In the event mediation is not used or if used is unsuccessful, the parties to this Agreement will enter into private, final and binding arbitration to resolve the dispute.

1) Each party to this Contract shall select an Arbitrator who shall hold an active license as either a Contractor, Architect, or Civil Engineer in the State of California. The arbitrators so selected shall in turn select a third arbitrator who shall also be so licensed and shall be the chairman of the Arbitration Hearing. If any party refused or neglects to appoint his/her arbitrator or to participate in the arbitration within twenty (20) days after receiving notice thereof, the Arbitrator or Arbitrators are empowered to decide the controversy in accordance with whatever evidence is presented. The Arbitrators are authorized to award reasonable costs, expenses, and attorney fees. Any decision of this Arbitration Board shall be binding by simple majority vote of the Arbitrators.

2) Time is of the essence. The arbitrators chosen by the parties shall select the third arbitrator within fourteen (14) days and the arbitration shall commence within forty-five (45) days of the selection of the second arbitrator. The decision of the arbitrators shall be rendered within ten (10) days of the conclusion of the arbitration hearings.

3) The arbitrators may administer the proceedings pursuant to the American Arbitration Association Construction Industry rules or use such procedural rules as they see fit. This section shall prevail over any conflict with the California Code of Civil Procedure. The arbitrators are empowered to provide whatever interim relief is necessary to safeguard property or issues in dispute without prejudiced to the rights of the parties or the issuance of the final award.

4) Small Dispute Exception. The parties agree that if the amount in dispute is less than $10,000.00, the above alternative dispute resolution rules apply but that a single arbitrator shall serve rather than a panel of three. If the parties cannot mutually agree on an arbitrator, then they shall use the American Arbitration Association to choose the single arbitrator and otherwise conduct the arbitration.

Contractor _____          Owner/Agent _____
                                            _____

1

Page 35 of 39 Received on 12/6/2006 2:17:10 PM [US Mountain Standard Time]

NOTICE: BY INITIALING IN THE SPACE BELOW, YOU ARE AGREEING TO HAVE
ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION
OF DISPUTES" PROVISIONS DECIDED BY NEUTRAL ARBITRATION AS PROVIDED
BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MAY POSSESS
TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING
IN THE SPACE BELOW, YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO
DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED
IN THE "ARBITRATION OF DISPUTES" PROVISION. IF YOU REFUSE TO SUBMIT TO
ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED
TO ARBITRATE UNDER THE AUTHORITY OF THE BUSINESS AND PROFESSIONS
CODE OR OTHER APPLICABLE LAWS. YOUR AGREEMENT TO THIS ARBITRATION
PROVISION IS VOLUNTARY.

WE HAVE READ AND UNDERSTOOD THE FOREGOING AND AGREE TO SUBMIT
DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION
DISPUTES" PROVISION TO NEUTRAL ARBITRATION.

Initial (s)_____    Date___5/8/22_____

Initial (s)_____    Date_____

Initial (s)_____    Date_____

2

Page 36 of 39 Received on 12/6/2006 2:17:10 PM [US Mountain Standard Time]

| CANYON CONSTRUCTION | General Building Contractors<br>Since 1966 | Lic. No. 785932 |

## NOTICE OF CANCELLATION
### Exhibit "G"

_____
*(Date of Transaction)*

You may cancel this transaction, without any penalty or obligation, within three (3) business days from the above date.

If you cancel, any property traded in, any payments made by you under the contract or sale, and any negotiable instrument executed by you will be returned within ten (10) business days following receipt by the seller of your cancellation notice, and any security interest arising out of the transaction will be cancelled.

If you cancel, you must make available to the seller at your residence, in substantially as good condition as when received, any goods delivered to you under this contract or sale; or you may if you wish, comply with the instruction of the seller regarding the return shipment of the goods at the seller's expense and risk.

If you do make the goods available to the seller and the seller does not pick them up within twenty (20) days of the date of your notice of cancellation, you may retain or dispose of the goods without any further obligation. If you fail to make the goods available to the seller, or if you agree to return the goods to the seller and fail to do so, then you remain liable for performance of all obligations under the contract.

To cancel this transaction, mail or deliver a signed and dated copy of this cancellation notice, or any other written notice, or send a telegram, to:

_____, at _____
   *(Name of Seller)*                          *(Address of Seller's Place of Business)*

NOT LATER THAN MIDNIGHT OF _____
                                                *(Date)*

I HEREBY CANCEL THIS TRANSACTION:

_____          _____
   *(Date)*                               *(Buyer's Signature)*

Page 37 of 39 Received on 12/6/2006 2:17:10 PM [US Mountain Standard Time]

| CANYON CONSTRUCTION | General Building Contractors Since 1966 | Lic. No. 785932 |

## NOTICE OF CANCELLATION
### Exhibit "G"

_____
(Date of Transaction)

You may cancel this transaction, without any penalty or obligation, within three (3) business days from the above date.

If you cancel, any property traded in, any payments made by you under the contract or sale, and any negotiable instrument executed by you will be returned within ten (10) business days following receipt by the seller of your cancellation notice, and any security interest arising out of the transaction will be cancelled.

If you cancel, you must make available to the seller at your residence, in substantially as good condition as when received, any goods delivered to you under this contract or sale; or you may if you wish, comply with the instruction of the seller regarding the return shipment of the goods at the seller's expense and risk.

If you do make the goods available to the seller and the seller does not pick them up within twenty (20) days of the date of your notice of cancellation, you may retain or dispose of the goods without any further obligation. If you fail to make the goods available to the seller, or if you agree to return the goods to the seller and fail to do so, then you remain liable for performance of all obligations under the contract.

To cancel this transaction, mail or deliver a signed and dated copy of this cancellation notice, or any other written notice, or send a telegram, to:

_____, at _____
(Name of Seller)                                        (Address of Seller's Place of Business)

NOT LATER THAN MIDNIGHT OF _____
                                                        (Date)

I HEREBY CANCEL THIS TRANSACTION:

_____            _____
(Date)                                                      (Buyer's Signature)

Page 38 of 39 Received on 12/6/2006 2:17:10 PM [US Mountain Standard Time]

| CANYON CONSTRUCTION | General Building Contractors Since 1966 | Lic. No. A785932 |
|---|---|---|

## Contract Fee
### Exhibit "I"

**Construction Contract**
Included herein, is a completed copy of the AIA Document A131/CMc, 1994 edition.

**Construction Fee (See Article 5.1.1)**
All subcontractors, labor and material costs are used to calculate the construction fee.

The 15 % fee includes profit and the following project related services:
1. Project accounting (Payables for materials and subcontractors, payroll, job costing and billings.)
2. Off-site project clerical services (secretarial, copying, typing, filing, etc.)
3. Manpower distribution
4. Home office overhead

Construction fee of 15% shall be billed on the 1st and the 15th of each month for the ongoing costs of the work

Canyon Construction:                                    Owner/Agent(s):

_____  5/3/22
President                        Date

                                                       _____
                                                       Owner/Agent            Date

                                                       _____
                                                       Owner/Agent            Date

Page 39 of 39 Received on 12/6/2006 2:17:10 PM [US Mountain Standard Time]

Fee Proposal                                              Project No. 02005
HAMELL RESIDENCE RETAINING WALLS                              Page 2 of 2

If there are protracted delays for reasons beyond our control, or if construction is not started within the customary period of time after completion of our final drawings, we would expect to renegotiate with you the basis for our compensation in order to take into consideration changes in price indices and pay scales applicable to the period when services are in fact being rendered.

If the foregoing correctly summarizes your understanding of the approximate scope of work and the services that you require, and the proposed fee is acceptable, please sign in the space below and return a copy of this proposal for our files.  We can start work on approximately February 15, 2002, but not before we have received a signed copy of this proposal.

Thank you for the opportunity to present this proposal.

Regards,
INGRAHAM/DeJESSE ASSOCIATES INC.


Stephen DeJesse
Structural Engineer
Principal



Accepted by: _____        Date: _____
          Steve Hamill



Enclosures